No. 23-1692

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

UNITED STATES OF AMERICA,

Appellee,

v.

**SIXTO JORGE DIAZ-COLON,**

Defendant–Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO, NO. 3:21-CR-17 (BESOSA, J.)

_____

## BRIEF FOR THE UNITED STATES

_____

W. STEPHEN MULDROW
 United States Attorney

MYRIAM Y. FERNANDEZ-GONZALEZ
 Assistant U.S. Attorney
 District of Puerto Rico

NICOLE M. ARGENTIERI
 Principal Deputy Assistant Attorney
 General

LISA H. MILLER
 Deputy Assistant Attorney General

MICHAEL N. LANG
 Trial Attorney
 Public Integrity Section

JOHN-ALEX ROMANO, Attorney
 U.S. Department of Justice
 Criminal Division, Appellate Section
 950 Pennsylvania Avenue, NW
 Washington, DC 20530

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES ........................................................ vi

STATEMENT OF JURISDICTION.............................................. 1

STATEMENT OF THE ISSUES ................................................... 1

STATEMENT OF THE CASE ...................................................... 2

    I.    Procedural History....................................................... 2

    II.    Relevant Facts ............................................................. 2

        A.    Diaz-Colon Threatens Anthony Maceira and Others with Professional Harm in a Secret Telegram Message. ........................................................... 3

        B.    Diaz-Colon Attempts to Extort Money from Maceira at Musa. ................................................... 6

        C.    The Publication of Offensive Chat Messages Involving Senior Administration Officials Roils Puerto Rico's Government. .................................................... 8

        D.    Diaz-Colon Attempts to Extort Money from Maceira at Il Postino. .................................................. 9

        E.    Diaz-Colon Deletes His Telegram Chat Conversation with Maceira While Meeting with the FBI. ..................... 14

        F.    The Jury Convicts Diaz-Colon........................................ 16

    III.    Rulings Under Review ............................................. 17

SUMMARY OF ARGUMENT ................................................. 17

ARGUMENT.......................................................................... 21

    I.    The Evidence Amply Supports Diaz-Colon's Convictions. ........ 21

A.    Background ....................................................... 22

B.    Standard of Review ........................................... 23

C.    The Evidence Proved That Diaz-Colon Attempted to Commit Extortion (Count One). ...................................... 24

    1.    Legal background .................................................. 24

    2.    The evidence was sufficient. ................................. 26

    3.    Diaz-Colon's arguments lack merit. ....................... 34

        a.    Diaz-Colon relies improperly on material outside the trial record. ................................... 34

        b.    The evidence amply proved that Diaz-Colon took a substantial step toward committing extortion. .................................... 35

        c.    The extortion scheme did not end with the leak of chat messages. ................................... 37

        d.    The property that Diaz-Colon attempted to extort—including renewed government contracts—was cognizable under the Hobbs Act. ...................................................... 39

D.    The Evidence Proved That Diaz-Colon Committed Extortion by Interstate Communication of a Threat (Count Two). ...................................................... 43

    1.    Legal background .................................................. 43

    2.    The evidence was sufficient. ................................. 44

    3.    Diaz-Colon's arguments lack merit. ....................... 45

        a.    Diaz-Colon's conduct was not protected by the First Amendment. ............................... 45

        b.     Section 875(d) does not require that the threatening communication itself contain a demand for money or something else of value. ........................................................... 50

   E.   The Evidence Proved That Diaz-Colon Destroyed Records in a Federal Investigation (Count Three). ............ 51

       1.    Legal background .................................................... 51

       2.    The evidence was sufficient. .................................. 52

       3.    Diaz-Colon's arguments lack merit. ........................ 55

           a.     The government's presentation of evidence identified the messages that Diaz-Colon deleted. ...................................... 55

           b.     The jury properly credited Agent Lopez's testimony. ...................................................... 55

           c.     Diaz-Colon's consent to agents reviewing certain messages on his phone did not mitigate his criminal intent. ........................... 56

II.   The District Court Correctly Denied Diaz-Colon's Variance Claim. ..................................................................................... 57

   A.   Background ..................................................................... 58

   B.   Standard of Review ......................................................... 59

   C.   The Evidence Was Not at Fatal Variance with the Attempted Extortion Offense Charged in the Indictment. .................................................................... 59

III.   The District Court Correctly Rejected Diaz-Colon's Claims of Prosecutorial Misconduct. ................................................. 64

   A.   Background ..................................................................... 65

|  |  | 1. | Pretrial request related to Musa recording ............... 65 |
|  |  | 2. | Relevant trial proceedings and testimony ................ 66 |
|  |  | 3. | New-trial motion and ruling ................................... 69 |
|  | B. | Standards of Review .......................................................... 70 |
|  | C. | The Government Did Not Present or Sponsor False Testimony in the Grand Jury. ......................................... 72 |
|  |  | 1. | Agent Lopez ....................................................... 72 |
|  |  | 2. | Raul Maldonado-Nieves ....................................... 74 |
|  |  | 3. | Lydmarie Torres .................................................. 76 |
|  | D. | The Government Did Not Present or Sponsor False Trial Testimony by Maceira. .............................................. 77 |
|  | E. | The Government Complied with its *Brady* Obligations. ....................................................................... 80 |
| IV. | The District Court Reasonably Limited the Defense's Cross-Examination of Two Witnesses. .............................................. 85 |
|  | A. | Background .................................................................... 85 |
|  |  | 1. | Agent Lopez ....................................................... 85 |
|  |  | 2. | Maceira .............................................................. 87 |
|  | B. | Standard of Review .......................................................... 89 |
|  | C. | No Confrontation Clause Violation Occurred. ................. 89 |
|  |  | 1. | Agent Lopez ....................................................... 90 |
|  |  | 2. | Maceira .............................................................. 95 |
| V. | The District Court Did Not Reversibly Err In Instructing The Jury On The Charged Offenses. ........................................... 98 |

A.    Background ...................................................... 99

B.    Standard of Review ....................................... 102

C.    No Reversible Error Occurred........................ 102

      1.    The district court correctly instructed the jury on the meaning of a substantial step............................ 103

      2.    The district court did not plainly err in allowing the jury to consider government contracts as property. ............................................................. 105

      3.    The district court properly gave an aiding-and-abetting instruction on Count One. ....................... 107

      4.    The omission of wrongfulness language in the Count Two instructions does not warrant reversal. .............................................................. 109

      5.    The district court correctly rejected Diaz-Colon's request for an instruction to disregard certain language in the indictment. ....................... 112

CONCLUSION ......................................................... 115

CERTIFICATE OF COMPLIANCE ........................... 116

CERTIFICATE OF SERVICE ................................... 117

# TABLE OF AUTHORITIES

## Cases

*Brady v. Maryland,*
373 U.S. 83 (1963) ........................................................... 1, 19, 71

*Counterman v. Colorado,*
600 U.S. 66 (2023) ............................................................ 49, 51

*Delaware v. Van Arsdall,*
475 U.S. 673 (1986) ........................................................... 90, 97

*Elonis v. United States,*
575 U.S. 723 (2015) ................................................................ 49

*Giboney v. Empire Storage & Ice Co.,*
336 U.S. 490 (1949) ................................................................ 46

*Giglio v. United States,*
405 U.S. 150 (1972) ................................................................ 71

*Griffin v. United States,*
502 U.S. 46 (1991) ................................................................. 33

*Henry v. Ryan,*
720 F.3d 1073 (9th Cir. 2013) .................................................... 79

*Keys v. United States,*
126 F.2d 181 (8th Cir. 1942) ..................................................... 48

*Kyles v. Whitley,*
514 U.S. 419 (1995) ................................................................ 84

*Musacchio v. United States,*
577 U.S. 237 (2016) ................................................................ 35

*Napue v. Illinois,*
360 U.S. 264 (1959) ................................................................ 71

*Neder v. United States,*
527 U.S. 1 (1999) ................................................................. 110

*Paonessa v. Hall,*
241 F. App'x 391 (9th Cir. 2007) ............................................................. 83

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) ................................................................................ 46

*Richardson v. Marsh,*
481 U.S. 200 (1987) .............................................................................. 114

*Rosemond v. United States,*
572 U.S. 65 (2014) .................................................................................. 26

*Sekhar v. United States,*
570 U.S. 729 (2013) .................................................................... 39, 40, 41

*Strickler v. Greene,*
527 U.S. 263 (1999) ................................................................................ 80

*United States v. Alverio-Meléndez,*
640 F.3d 412 (1st Cir. 2011) ..................................................................... 2

*United States v. Arcadipane,*
41 F.3d 1 (1st Cir. 1994)......................................................................... 61

*United States v. Avenatti,*
81 F.4th 171 (2d Cir. 2023), *petition for cert. filed*, No. 23-6753 (Feb.
12, 2024) ................................................................................................ 44

*United States v. Beauchamp,*
986 F.2d 1 (1st Cir. 1993)........................................................................ 96

*United States v. Bender,*
304 F.3d 161 (1st Cir. 2002) .................................................................... 81

*United States v. Berk,*
652 F.3d 132 (1st Cir. 2011) .................................................................... 28

*United States v. Bly,*
510 F.3d 453 (4th Cir. 2007) .............................................................47, 48

*United States v. Boyce,*
742 F.3d 792 (7th Cir. 2014) ................................................................... 91

*United States v. Brennick,*
    405 F.3d 96 (1st Cir. 2005) ...................................................... 70

*United States v. Brissette,*
    919 F.3d 670 (1st Cir. 2019) ....................................... 41, 42, 62

*United States v. Brown,*
    669 F.3d 10 (1st Cir. 2012) ...................................................... 92

*United States v. Bucci,*
    525 F.3d 116 (1st Cir. 2008) .................................................... 92

*United States v. Bucci,*
    839 F.2d 825 (1st Cir. 1998) .................................................... 25

*United States v. Buffis,*
    867 F.3d 230 (1st Cir. 2017) .................................................... 39

*United States v. Burhoe,*
    871 F.3d 1 (1st Cir. 2017) ........................................................ 42

*United States v. Carroll,*
    105 F.3d 740 (1st Cir. 1997) .................................................... 56

*United States v. Casey,*
    825 F.3d 1 (1st Cir. 2016) .................................................. 89, 90

*United States v. Celestin,*
    612 F.3d 14 (1st Cir. 2010) ...................................................... 84

*United States v. Correia,*
    55 F.4th 12 (1st Cir. 2022) .................................... 102, 103, 105

*United States v. Coss,*
    677 F.3d 278 (6th Cir. 2012) .................... 43, 44, 47, 48, 110, 111

*United States v. Cruzado-Laureano,*
    404 F.3d 470 (1st Cir. 2005) .............................................. 24, 25

*United States v. Cruz-Arroyo,*
    461 F.3d 69 (1st Cir. 2006) ........................................ 25, 59, 60

*United States v. Cruz-Rodríguez*,
    541 F.3d 19 (1st Cir. 2008) ...................................................................... 96

*United States v. Daley*,
    564 F.2d 645 (2d Cir. 1977)...................................................................... 24

*United States v. Davis*,
    855 F. App'x 362 (9th Cir. 2021) ............................................................. 54

*United States v. DeCologero*,
    530 F.3d 36 (1st Cir. 2008) ...................................................................... 91

*United States v. Del Valle-Cruz*,
    785 F.3d 48 (1st Cir. 2015) ........................................................... 22, 76, 95

*United States v. DeSimone*,
    488 F.3d 561 (1st Cir. 2007) .................................................................... 89

*United States v. DeStefano*,
    59 F.3d 1 (1st Cir. 1995)........................................................................ 105

*United States v. Díaz-Rodríguez*,
    853 F.3d 540 (1st Cir. 2017) .................................................................. 107

*United States v. DiDonna*,
    866 F.3d 40 (1st Cir. 2017)........................................................... 24, 25, 29

*United States v. Doyon*,
    194 F.3d 207 (1st Cir. 1999) .................................................................... 25

*United States v. Dunnigan*,
    507 U.S. 87 (1993) ................................................................................... 73

*United States v. Eagle Elk*,
    820 F.2d 959 (8th Cir. 1987) ................................................................. 108

*United States v. Enmons*,
    410 U.S. 396 (1973) ......................................................................... 31, 109

*United States v. Escobar-de-Jesús*,
    187 F.3d 148 (1st Cir. 1999) .............................................................. 59, 62

*United States v. Ferguson,*
676 F.3d 260 (2d Cir. 2011) ................................................ 108

*United States v. Flores-Rivera,*
787 F.3d 1 (1st Cir. 2015) ............................................71, 79

*United States v. Galíndez,*
999 F.3d 60 (1st Cir. 2021) ................................................ 109

*United States v. Garcia,*
400 F.3d 816 (9th Cir. 2005) ............................................. 108

*United States v. Gaw,*
817 F.3d 1 (1st Cir. 2016) .................................................. 26

*United States v. Gee,*
695 F.2d 1165 (9th Cir. 1983) ............................................. 84

*United States v. George,*
658 F.3d 706 (7th Cir. 2011) ............................................. 108

*United States v. Gonsalves,*
668 F.2d 73 (1st Cir. 1982) ................................................ 31

*United States v. Greaux-Gomez,*
52 F.4th 426 (1st Cir. 2022) ............................................... 62

*United States v. Guzman,*
603 F.3d 99 (1st Cir. 2010) ................................................ 89

*United States v. Hall,*
434 F.3d 42 (1st Cir. 2006) ................................................ 81

*United States v. Hankton,*
51 F.4th 578 (5th Cir. 2022) ............................................. 108

*United States v. Hatch,*
434 F.3d 1 (1st Cir. 2006) .................................................. 23

*United States v. Hathaway,*
534 F.2d 386 (1st Cir. 1976) ............................................... 24

*United States v. Hobgood*,
    868 F.3d 744 (8th Cir. 2017) ................................................................. 43

*United States v. Horton*,
    921 F.2d 540 (4th Cir. 1990) ............................................................... 108

*United States v. House*,
    684 F.3d 1173 (11th Cir. 2012) ........................................................... 112

*United States v. Hunt*,
    526 F.3d 739 (11th Cir. 2008) ............................................................... 54

*United States v. Hutson*,
    843 F.2d 1232 (9th Cir. 1988) ........................................................ 47, 48

*United States v. Jackson*,
    180 F.3d 55 (2d Cir. 1999) ....................................... 43, 44, 45, 110, 111

*United States v. Jordan*,
    810 F.2d 262 (D.C. Cir. 1987) ............................................................... 93

*United States v. Joyce*,
    693 F.2d 838 (8th Cir. 1982) ................................................................. 36

*United States v. Kanodia*,
    943 F.3d 499 (1st Cir. 2019) ................................................................. 23

*United States v. Karani*,
    984 F.3d 163 (1st Cir. 2021) ............................................................... 114

*United States v. Katana*,
    93 F.4th 521 (1st Cir. 2024) ...................................................... 59, 63, 64

*United States v. Kenny*,
    645 F.2d 1323 (9th Cir. 1981) ............................................................... 93

*United States v. Kernell*,
    667 F.3d 746 (6th Cir. 2012) ................................................................. 53

*United States v. Killen*,
    729 F. App'x 703 (11th Cir. 2018) .................................................. 49, 50

*United States v. Kirsch*,
    903 F.3d 213 (2d Cir. 2018) ................................................................ 41

*United States v. Laboy-Delgado*,
    84 F.3d 22 (1st Cir. 1996) ................................................................. 98

*United States v. Latorre-Cacho*,
    874 F.3d 299 (1st Cir. 2017) ............................................................ 107

*United States v. Law*,
    528 F.3d 888 (D.C. Cir. 2008) ......................................................... 104

*United States v. Mangual-Garcia*,
    505 F.3d 1 (1st Cir. 2007) ............................................................ 71, 79

*United States v. Marino*,
    277 F.3d 11 (1st Cir. 2002) ............................................................. 107

*United States v. Marsh*,
    26 F.3d 1496 (9th Cir. 1994) ..................................................... 35, 104

*United States v. Martí-Lón*,
    524 F.3d 295 (1st Cir. 2008) ............................................................ 109

*United States v. Martínez*,
    994 F.3d 1 (1st Cir. 2021) ................................................................ 59

*United States v. McBride*,
    962 F.3d 25 (1st Cir. 2020) .............................................................. 114

*United States v. McDowell*,
    918 F.2d 1004 (1st Cir. 1990) ........................................................... 92

*United States v. McPhail*,
    831 F.3d 1 (1st Cir. 2016) ................................................................. 23

*United States v. Millan*,
    230 F.3d 431 (1st Cir. 2000) ............................................................ 89

*United States v. Mitov*,
    460 F.3d 901 (7th Cir. 2006) ............................................................ 32

*United States v. Monholland,*
   607 F.2d 1311 (10th Cir. 1979) ................................................................. 36

*United States v. Morales,*
   801 F.3d 1 (1st Cir. 2015) ...................................................................... 106

*United States v. Morales-Rodríguez,*
   467 F.3d 1 (1st Cir. 2006) ........................................................................ 80

*United States v. Muhammad,*
   14 F.4th 352 (5th Cir. 2021) ...............................................................71, 72

*United States v. Nell,*
   570 F.2d 1251 (5th Cir. 1978) .................................................................. 31

*United States v. Nishnianidze,*
   342 F.3d 6 (1st Cir. 2003) ....................................................................43, 50

*United States v. Orlandella,*
   96 F.4th 71 (1st Cir. 2024) ...................................................................71, 72

*United States v. Parks,*
   100 F.3d 1300 (7th Cir. 1996) .................................................................. 83

*United States v. Pascucci,*
   943 F.2d 1032 (9th Cir. 1991) .................................................................. 44

*United States v. Paz-Alvarez,*
   799 F.3d 12 (1st Cir. 2015) ...................................................................... 22

*United States v. Pena,*
   910 F.3d 591 (1st Cir. 2018) ................................................................... 108

*United States v. Pendergraft,*
   297 F.3d 1198 (11th Cir. 2002) ................................................................ 31

*United States v. Pérez-Rodríguez,*
   13 F.4th 1 (1st Cir. 2021) .............................................25, 36, 103, 104

*United States v. Peters,*
   732 F.2d 1004 (1st Cir. 1984) .................................................................. 84

*United States v. Pizarro,*
  772 F.3d 284 (1st Cir. 2014) .................................................. 110

*United States v. Ponzo,*
  853 F.3d 558 (1st Cir. 2017) .................................................. 114

*United States v. Prieto,*
  812 F.3d 6 (1st Cir. 2016) ...................................................... 107

*United States v. Pungitore,*
  910 F.2d 1084 (3d Cir. 1990) .................................................. 62

*United States v. Quinn,*
  514 F.2d 1250 (5th Cir. 1975) ................................................. 47

*United States v. Ramirez-Frechel,*
  23 F.4th 69 (1st Cir.), *cert. denied*, 142 S. Ct. 2828 (2022) .......................... 56

*United States v. Raymond,*
  697 F.3d 32 (1st Cir. 2012) ..................................... 89, 90, 94, 98

*United States v. Renzi,*
  769 F.3d 731 (9th Cir. 2014) ............................................. 77, 78

*United States v. Reyes-Echevarría,*
  345 F.3d 1 (1st Cir. 2003) ........................... 71, 72, 74, 75, 76, 77

*United States v. Rivera Rangel,*
  396 F.3d 476 (1st Cir. 2005) .............................................. 30, 32

*United States v. Rivera-Donate,*
  682 F.3d 120 (1st Cir. 2012) .................................................. 89

*United States v. Rodriguez,*
  63 F.3d 1159 (1st Cir. 1995) .............................................. 96, 98

*United States v. Rodríguez,*
  215 F.3d 110 (1st Cir. 2000) ................................................. 107

*United States v. Rodríguez-Milián,*
  820 F.3d 26 (1st Cir. 2016) ................................................... 59

*United States v. Sayer*,
748 F.3d 425 (1st Cir. 2014) ...................................................... 46

*United States v. Scott*,
70 F.4th 846 (5th Cir. 2023) ...................................................... 52

*United States v. Scott*,
979 F.3d 986 (2d Cir. 2020)........................................................ 52

*United States v. Staggers*,
961 F.3d 745 (5th Cir. 2020) ..................................................... 34

*United States v. Stevens*,
559 U.S. 460 (2010) .................................................................. 46

*United States v. Stover*,
499 F. App'x 267 (4th Cir. 2012) .............................................. 54

*United States v. Sturm*,
870 F.2d 769 (1st Cir. 1989) .............................................31, 109

*United States v. Temkin*,
797 F.3d 682 (9th Cir. 2015) ..................................................... 36

*United States v. Turner*,
501 F.3d 59 (1st Cir. 2007)....................................... 25, 36, 103

*United States v. Valentini*,
944 F.3d 343 (1st Cir. 2019) ...............................................41, 62

*United States v. Van Anh*,
523 F.3d 43 (1st Cir. 2008) ........................................................ 89

*United States v. VanderZwaag*,
467 F. App'x 402 (6th Cir. 2012) ............................................. 108

*United States v. Varani*,
435 F.2d 758 (6th Cir. 1970) ..................................................... 47

*United States v. Vázquez-Botet*,
532 F.3d 37 (1st Cir. 2008) ........................................................ 57

*United States v. Vázquez-Rosario,*
  45 F.4th 565 (1st Cir. 2022)..............................................................21, 76

*United States v. Vega-Martínez,*
  949 F.3d 43 (1st Cir. 2020) .................................................................. 102

*United States v. Villalobos,*
  748 F.3d 953 (9th Cir. 2014) ................................................................ 112

*United States v. Von der Linden,*
  561 F.2d 1340 (9th Cir. 1977).................................................................. 48

*United States v. Walker,*
  99 F.3d 439 (D.C. Cir. 1996)................................................................... 33

*United States v. White,*
  810 F.3d 212 (4th Cir. 2016) .............................................................43, 50

*United States v. White,*
  868 F.2d 305 (8th Cir. 1989) ................................................................. 93

*United States v. Whitman,*
  771 F.2d 1348 (9th Cir. 1985)................................................................. 93

*United States v. Williams,*
  952 F.2d 1504 (6th Cir. 1991)................................................................. 94

## Statutes and Rules

18 U.S.C. § 2.........................................................................................2, 108

18 U.S.C. § 875 .........................................2, 18, 23, 43, 47, 49, 50, 62, 99, 110

18 U.S.C. § 876 ........................................................................................ 47

18 U.S.C. § 1519 .............................................................................2, 18, 51

18 U.S.C. § 1621 ...................................................................................... 73

18 U.S.C. § 1951 ............................................... 2, 17, 24, 32, 39, 40, 106, 109

18 U.S.C. § 3231 ....................................................................................... 1

28 U.S.C. § 1291 ....................................................................................... 1

Fed. R. App. P. 4 .................................................................. 1

Fed. R. Crim. P. 29 ............................................................. 22

Fed. R. Crim. P. 30 ............................................................ 105

Fed. R. Crim. P. 52 ............................................................. 71

Fed. R. Evid. 106 (2011).................................................... 92

Fed. R. Evid. 801 ...........................................................91, 92

Fed. R. Evid. 802 ............................................................... 91

Fed. R. Evid. 803 ............................................................... 91

## STATEMENT OF JURISDICTION

Defendant Sixto Jorge Diaz-Colon appeals from the judgment of conviction entered by the district court (Besosa, J.) on August 4, 2023. App.41-42.[1] The district court had jurisdiction under 18 U.S.C. § 3231. Diaz-Colon timely filed a notice of appeal on August 8, 2023. App.42; *see* Fed. R. App. P. 4(b)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether sufficient evidence supported Diaz-Colon's convictions for attempted extortion, transmitting a threat in interstate commerce with intent to extort, and destroying records in a federal investigation.

2. Whether trial evidence concerning Diaz-Colon's outstanding debts created a prejudicial variance with the allegations in the indictment.

3. Whether the district court properly rejected Diaz-Colon's claims that the government suborned perjury in the grand jury and at trial, and violated *Brady v. Maryland*, 373 U.S. 83 (1963).

4. Whether the district court's limitations on Diaz-Colon's cross-examination of two witnesses violated his confrontation right.

---

[1] "App." refers to Diaz-Colon's appendix; "Suppl-App." refers to his supplemental appendix of exhibits; "S-Suppl-App." refers to his sealed supplemental appendix; "Br." refers to his opening brief; "Add." refers to the addendum to his brief; and "D.E." refers to district court docket entries.

5. Whether the district court reversibly erred in instructing the jury on the charged offenses.

## STATEMENT OF THE CASE

### I.   PROCEDURAL HISTORY

On January 26, 2021, a federal grand jury in the District of Puerto Rico returned an indictment charging Diaz-Colon with attempted extortion, in violation of 18 U.S.C. §§ 1951, 2 (Count One); transmitting a threatening communication in interstate or foreign commerce with intent to extort, in violation of 18 U.S.C. §§ 875(d), 2 (Count Two); and destroying records in a federal investigation, in violation of 18 U.S.C. § 1519 (Count Three). App.44-51. A petit jury convicted Diaz-Colon on all counts after a two-week trial. App.34. The district court sentenced him to 51 months of imprisonment, to be followed by three years of supervised release. Add.2-3.

### II.   RELEVANT FACTS

Diaz-Colon was an influential media producer in Puerto Rico. App.282-83. Viewed in the light most favorable to the guilty verdict, *see United States v. Alverio-Meléndez*, 640 F.3d 412, 416 n.1 (1st Cir. 2011), the evidence proved that, in 2019, Diaz-Colon attempted to extort hundreds of thousands of dollars from a senior Puerto Rican official, Anthony Maceira, by threatening to release politically damaging internal communications by then-Governor Ricardo

Rosselló and members of his administration. Diaz-Colon later deleted incriminating communications with Maceira from his phone while being interviewed by federal agents.

### A. Diaz-Colon Threatens Anthony Maceira and Others with Professional Harm in a Secret Telegram Message.

Diaz-Colon produced a political news program, Nación Z, that aired on radio and television. App.282. Maceira was an attorney who worked in the administration of former Puerto Rico Governor Rosselló from March 2018 until the latter half of 2019, serving first as the Executive Director of the Ports Authority and then concurrently as the Secretary of Public Affairs. App.256-58, 262, 268. Maceira and Diaz-Colon had a good professional relationship. App.283. Maceira appeared for several interviews on Nación Z, and the two communicated at least once a week, including over Telegram—a popular, cloud-based messaging system. App.283-85, 633-34.

Telegram gives users the option to send secret messages. App.285. When a secret message is transmitted, Telegram notifies the sender if the recipient takes a screenshot or forwards the message; the sender can also set a self-destruct timer that causes the message to disappear from both users' devices in a certain amount of time. App.285. Telegram was often used by officials in the Rosselló administration. App.286. All Telegram messages sent or received by users in

Puerto Rico are transmitted through servers located in foreign countries. App.631-32, 660-63.

On June 20, 2019, Diaz-Colon sent Maceira a secret Telegram message, which Maceira received while working in his Public Affairs office in Fortaleza, the Governor's mansion in Puerto Rico. App.264, 287-88. The message indicated that Raul Maldonado-Nieves (hereafter "Raulie" or "Maldonado-Nieves"), the son of then-Treasury Secretary Raul Maldonado, had information that would prove ruinous to the Rosselló administration, including Maceira personally, unless the administration stopped politically attacking Maldonado. Suppl-App.125. At that time, Maldonado faced negative media attention over his alleged improper interference in contract and personnel matters. App.265-67, 292-94. As translated, Diaz-Colon's Telegram message stated:

> Man, if Fortaleza doesn't stop f*cking with Raul Maldonado, RAUL MALDONADO'S SON HAS STRONG EVIDENCE TO F*CK THIS ADMINISTRATION STARTING WITH RICARDO ROSSELLO.
>
> According to Raulie "son of RM", you and Fortaleza are the ones who are behind this firepower against Raul Maldonado.
>
> I tell you brother, RAUL'S SON IS GOING TO DESTROY YOU ALL AT OTHER LEVELS.
>
> I don't know what you are going to do. But if they don't stop THE POPULARS ARE GOING TO BE IN POWER FOR 30 YEARS.
>
> STOP THIS.

> This is crazy.
>
> I have a friend who is a close friend of RM's son, and they want to see me to deliver hard evidence to me and other media. This administration is f*cked. I need to stop this.

Suppl-App.125. Maceira copied the secret Telegram message into the Notes application on his cellphone, rather than taking a screenshot of it, to avoid alerting Diaz-Colon. App.289-90.

At this time, Maceira had been serving as Public Affairs Secretary—the Government's main spokesperson—for approximately six months. App.263, 297. Maceira did not know what "hard evidence" Diaz-Colon was referring to when he reported that Maldonado-Nieves would destroy Maceira and the administration. App.295-96. But Maceira was "scared" and "frightened." App.297. He viewed the message as a threat from a radio and television producer that needed to be taken seriously. App.303. Maceira was concerned about the potential harm to the administration and to his own employment, reputation, family, and family name. App.303.

After alerting the Governor and the Governor's chief of staff to the threatening message, Maceira communicated with Diaz-Colon over WhatsApp. App.297-98. The two agreed to meet the next day, June 21, at a San Juan restaurant named Musa. App.298; Suppl-App.128.

**B.  Diaz-Colon Attempts to Extort Money from Maceira at Musa.**

Even though Musa was crowded and noisy when Maceira arrived, he attempted to record his conversation with Diaz-Colon (unbeknownst to Diaz-Colon) using his phone. App.303-04.

Maceira told Diaz-Colon that he considered Diaz-Colon's message from the previous day to be a threat. App.305. Diaz-Colon purported to apologize but went on to say that what he was seeing was going to destroy Maceira and the administration, adding that he had been sitting next to Maldonado-Nieves when he messaged Maceira. App.305-06. Diaz-Colon said that Maldonado-Nieves had a binder full of copied chat messages in which senior administration officials used highly offensive language, including to describe other political figures. App.309. For example, Diaz-Colon said that the Governor had called the former Senate president vulgar names in one chat, and Diaz-Colon mentioned evidence that the Attorney General had failed to investigate an adviser to the Governor who had been referred to Puerto Rico's Department of Justice. App.309; *see* S-Suppl-App.1108. Diaz-Colon emphasized that the disclosure of these materials would cause a scandal and damage the government. App.307-09. He also warned Maceira that Maldonado-Nieves was looking into information that Maceira had engaged in unspecified misconduct as Executive Director of the Ports Authority. App.310. Diaz-Colon said that Maldonado-Nieves was angry

about the public attacks on his father and blamed Maceira for being behind them. App.309.

Diaz-Colon described ways that he could help Maceira and the administration out of their predicament. App.311. First, he said that Maldonado-Nieves was demanding $300,000 in exchange for not releasing the binder of chats; if they gave $300,000, Diaz-Colon could ensure that the binder would not be released. App.311-12. Second, Diaz-Colon sought assistance with securing the renewal of two government contracts for companies operated by his associates—contracts from which Diaz-Colon profited—in exchange for Diaz-Colon using his influence to improve Maceira's public image. App.313-18. Third, Diaz-Colon offered to create a news segment that would give positive coverage to the administration and combat negative media attention, if Maceira guaranteed that the government would purchase advertising spots on Nación Z. App.311-12.

Diaz-Colon named opinionmakers in the media whom he controlled and said that he would be meeting with Maldonado-Nieves and a mutual friend to get a copy of the chat messages. App.317-19; *see also* App.314, 318 (Diaz-Colon tried to intimidate Maceira by leveraging his knowledge, power, and influence). Maceira ended the meeting after approximately one-and-a-half hours, telling Diaz-Colon that they would stay in communication. App.319. Maceira later

provided the recording of his meeting at Musa to the Federal Bureau of Investigation (FBI), but parts of the recording were not audible. App.538-42.

Maceira was scared and in shock when he left Musa, and he believed that Diaz-Colon was trying to extort him. App.316, 319-20; *see* App.306-07 (Diaz-Colon acted like a "gangster" in feigning concern for Maceira's situation). Maceira quickly reached out to, and met up with, a good friend for advice on what to do. App.320-21. A few days later, Maceira travelled at his own expense to Florida to meet with a former law enforcement official, Hector Pesquera, whom he trusted for guidance. App.321-24. Pesquera agreed to put Maceira in contact with the FBI in Puerto Rico. App.325.

### C. The Publication of Offensive Chat Messages Involving Senior Administration Officials Roils Puerto Rico's Government.

On June 24, 2019, the day Maceira left to meet Pesquera in Florida, Governor Rosselló dismissed Maldonado from his position as Treasury Secretary, an action that Maceira had recommended. App.267, 344. On the same day, Maldonado gave an interview to Nación Z accusing the government of having an institutional mafia. App.344. The political situation in Puerto Rico grew tumultuous as new allegations of corruption emerged, including ones made by Maldonado-Nieves, amid reports that some public officials faced imminent arrest. App.325-27. The Rosselló administration was "under fire." App.327.

On July 13, 2019, after an initial leak of select chat messages, 889 pages of a Telegram chat involving senior government officials were leaked to the public. App.330-35, 340-41, 543. The messages in this chat contained disparaging, misogynistic, and offensive comments about others. App.424-25. The released pages included a portion of the Telegram chat in which Maceira was a member. App.341-43. Diaz-Colon later told Maceira that it was Maldonado-Nieves who leaked the Telegram messages, having taken screenshots of all the messages as they appeared on his father's phone when Maldonado was still Treasury Secretary. App.400-02; Suppl-App.56-57. The July 13 release of messages resulted in public protests, more political and media scrutiny of the Rosselló administration, and the resignation of many senior administration officials, including the Governor himself on July 24. App.341-43, 407, 503.

### D. Diaz-Colon Attempts to Extort Money from Maceira at Il Postino.

On July 14, 2019, Diaz-Colon sent Maceira a secret Telegram message reminding him of their "pending" conversation. App.346-47. The next day, Maceira met with, and agreed to become a confidential source for, the FBI. App.347-49. On July 16, Maceira and Diaz-Colon exchanged several Telegram messages about getting together that evening, and they ultimately agreed to meet at Diaz-Colon's restaurant in San Juan, Il Postino, which Diaz-Colon selected

because it would not be busy. App.349-60; Suppl-App.130-32. Maceira used FBI-provided devices to record his conversation with Diaz-Colon at Il Postino. App.349, 361-62.

Maceira and Diaz-Colon met on the second floor of the restaurant and sat at a corner table only a few feet apart from each other. App.363-65. Among other things, Diaz-Colon told Maceira that the administration would not be in this situation if it had publicly supported former Secretary Maldonado and that it was Maldonado-Nieves who had leaked the messages. App.401-02, 405; Suppl-App.56-58. Diaz-Colon said that Maldonado-Nieves had access to, and was going to release, more chat messages, and he suggested that Maldonado-Nieves was out of control, wanted "to make everyone sh*t their pants," and was acting like the famous "Corleone Mafia." Suppl-App.81-84; App.428-29, 436-37. Maceira believed that Diaz-Colon referenced additional messages to make him fearful of the damage their release would cause. App.426.

Diaz-Colon specified three conditions that would prevent the release of additional chat messages and attacks on Maceira and the administration, and he lowered his voice when discussing these demands. App.371-74, 473-78; Suppl-App.94-102, 119-20. Two conditions were effectively the same ones Diaz-Colon had articulated at Musa. First, he said that Maldonado-Nieves was demanding $300,000 in exchange for not releasing more chat messages. Suppl-App.83-84,

96-98, 119. Diaz-Colon said that Maceira could provide the $300,000 to Diaz-Colon, or channel it through companies to which Diaz-Colon had access, and that he would facilitate getting the money to Maldonado-Nieves. Suppl-App.96-97, 101-02. Second, Diaz-Colon again sought assistance securing the renewal of two government contracts, which, he claimed, the new Treasury Secretary (Francisco Pares) was blocking. Suppl-App.85-90. Diaz-Colon revealed that he received retainers for each contract, and while he and Maceira were still at Il Postino, he texted Maceira the names of the companies (Collective Impact, LLC, and Social Consulting, LLC) and the contracting government agencies (respectively, Puerto Rico's Department of Treasury and Office of Management and Budget). Suppl-App.86, 104, 109, 120, 133 & nn.1-2. Maceira understood that Diaz-Colon wanted this contract assistance so that he could receive his monthly retainers. App.455.[2]

---

[2] The companies provided services of purported social value to the government. App.752-57, 818. Collective Impact's contract with the Treasury Department ran from April 22 to June 30, 2019. App.768. The company paid Diaz-Colon $1,500 for consulting services from the $9,800 it billed for April 2019; the company's invoice did not indicate that Diaz-Colon performed any work. App.771-83. The company did not pay Diaz-Colon anything from the next invoice, which the Treasury Department paid after the scandal came to light. App.788-92. The Treasury Department did not renew Collective Impact's contract after Secretary Maldonado was dismissed. App.266-67, 691-92, 745.

Social Consulting's contract with the Office of Management and Budget (OMB) ran from May 9 to June 30, 2019. App.821-22. Social Collective's president did not pursue payment from OMB for work performed in May 2019 based on

Diaz-Colon's third demand was new. Instead of the positive news program discussed at Musa, Diaz-Colon said that Maceira could pay tens of thousands of dollars to certain media influencers, whose messaging Diaz-Colon controlled, to dial back their negative coverage of the administration. Suppl-App.94-96, 98-102; App.458-62, 474-77. The most prominent influencer required a $50,000 payment, but Diaz-Colon purported to give Maceira a bargain by offering to deduct that $50,000 payment from the $300,000 payment going to Maldonado-Nieves. Suppl-App.119; App.498.

Diaz-Colon said that he disagreed with Maldonado-Nieves's demand for $300,000 and that he told Maldonado-Nieves, "That is called extortion. I am not going to do that." Suppl-App.60, 72, 118. Diaz-Colon also suggested that he merely had been passing along a threat from Maldonado-Nieves when he sent Maceira the June 20 Telegram message. Suppl-App.53. Maceira, however, believed that Diaz-Colon was actually "playing both sides; lighting the fire, but on the other side offering to become the firefighter … in exchange for money," App.414-15, 494-95.

When he left Il Postino, Maceira was "frightened" and concerned that he would be harmed personally and professionally if damaging information were

---

concerns that she developed over Collective Impact's payment to Diaz-Colon from the proceeds of its Treasury contract. App.822-25, 831-32.

released before the authorities took action. App.501. Diaz-Colon's conduct left Maceira feeling "constantly [ ] overwhelmed, scared, concerned, [and] preoccupied," including about his employment, and it interfered with his work as Ports Authority Executive Director and Public Affairs Secretary. App.514-18.

In the days that followed, Maceira exchanged Telegram messages with Diaz-Colon on the same conversation thread that contained messages about their coordination of the Il Postino meeting and the names of the two companies Diaz-Colon sent Maceira during their meeting. App.506-08; *see* Suppl-App.134-36. On July 19, 2019, while meeting with the FBI, Maceira messaged Diaz-Colon, "Bro, these have been difficult days. Thanks for the support." Suppl-App.136; App.508. Diaz-Colon responded, "ONWARD AND UPWARDS," and "HITTING HARD WITHOUT FEAR," to which Maceira replied, "I haven't forgotten. I am trying to do my homework. Next week we'll meet to discuss everything, including how we are going to do it now." Suppl-App.136. Diaz-Colon sent back emojis of a flexed bicep and heart. Suppl-App.136.

The FBI proposed a plan to make a controlled cash payment of $20,000 to Diaz-Colon. App.563-65. Maceira, however, did not agree to the plan; he was uncomfortable making the payment and was concerned that, because the amount was so far below the $300,000 that Diaz-Colon was demanding, Diaz-Colon might not accept the payment. App.502-04, 563-65.

### E. Diaz-Colon Deletes His Telegram Chat Conversation with Maceira While Meeting with the FBI.

On July 26, 2019, at around 8:30 a.m., FBI agents knocked on the door of Diaz-Colon's apartment; no one answered, but someone appeared to be inside. App.845-47. When agents returned at approximately 12:45 p.m., Diaz-Colon was waiting for them, gestured for them to come inside, and explained that he had told his wife not to answer the door earlier because he believed the agents were with the Internal Revenue Service, to which he owed money, or were going to seize his apartment because he was delinquent on payments. App.848-49; *see also* App.873-75 (evidence that Diaz-Colon was behind on mortgage and car-lease payments).

Special Agent Juan Carlos Lopez and other FBI agents interviewed Diaz-Colon in his home. App.917. While they were there, Diaz-Colon made a recorded call to Maldonado-Nieves.[3] App.850, 896. Although the agents had a search warrant for Diaz-Colon's phone, they did not execute the warrant right

---

[3] The contents of this recorded phone conversation were not introduced into evidence at trial. The defense attempted to elicit testimony from Agent Lopez about the substance of the conversation, but the district court ruled that Diaz-Colon needed to introduce this evidence through one of the conversation participants (Maldonado-Nieves or Diaz-Colon), which the defense did not attempt to do. *See* pp. 85-86, 94, *infra*. According to a transcript of the call, which the defense filed as an exhibit to a pretrial motion, Diaz-Colon told Maldonado-Nieves that Maceira was willing to pay $300,000 to prevent the release of more messages; Maldonado-Nieves replied that he was not interested in taking money and that his only goal was to stop the attacks on his father. S-Suppl-App. 70-71.

away. App.850, 918-19. When the agents were interviewing him, Diaz-Colon held his phone in his hands, but occasionally he placed the phone on the table, picked it up, and manipulated it. App.850. Before executing the warrant, the agents obtained his consent to review certain text messages between him and Maldonado-Nieves on his phone. App.918-19. The agents later executed the warrant, and they took Diaz-Colon's phone with them when they left his apartment at approximately 5:40 p.m. App.850-51.

Later that night, Maceira noticed that Telegram messages he had received from Diaz-Colon earlier in the day were erased; Maceira had seen a banner notification about the messages at the time but had not read the messages. App.504-05, 509-10. In fact, Maceira noticed that his entire conversation thread with Diaz-Colon on Telegram, including the messages exchanged on July 16 and 19, had been erased; Maceira and Diaz-Colon were the only participants in the chat, and Maceira did not erase it. App.510-11. Maceira informed the FBI about the deleted messages and sent the FBI a screenshot of his phone, taken at 8:09 p.m. on July 26, displaying the empty contents of his Telegram conversation with Diaz-Colon. Suppl-App.144; App.852. The screenshot of the Telegram page indicated that Diaz-Colon had last been active on Telegram about four hours earlier, when FBI agents were still at his residence. Suppl-App.144; App.512-14, 614-16, 850.

Law enforcement extracted the contents of Diaz-Colon's seized cellphone, which included SMS text messages and WhatsApp messages exchanged between Diaz-Colon and Maldonado-Nieves. App.854-56. For example, on June 22, 2019, the day after Diaz-Colon met with Maceira at Musa, Diaz-Colon messaged Maldonado-Nieves, "Bro, as I told you in the afternoon. Nothing has happened yet, the gasoline is still in the container. … We are moving forward!" Suppl-App.491. On June 24, the day Governor Rosselló fired Secretary Maldonado, Diaz-Colon messaged Maldonado-Nieves, "Raulie, where are you? This pile of sh*t is driving me crazy. We have to act with wisdom." Suppl-App.492. And on July 15, the day before Diaz-Colon met with Maceira at Il Postino, Diaz-Colon messaged Maldonado-Nieves several times stressing that it was important that they meet. Suppl-App.525-27; App.880-81.

### F. The Jury Convicts Diaz-Colon.

Diaz-Colon was later charged and arrested. App.3. The government's evidence at trial included, among other things, testimony by Maceira and Special Agent Lopez, the FBI agent who interviewed Diaz-Colon in his home; the recording of Maceira's meeting with Diaz-Colon at Il Postino; Telegram communications between Diaz-Colon and Maceira, including Diaz-Colon's message of June 20 and messages that Diaz-Colon deleted on July 26; and text

and WhatsApp messages exchanged between Diaz-Colon and Maldonado Nieves. The jury convicted Diaz-Colon of all charges. App.34.

## III.  RULINGS UNDER REVIEW

The rulings under review are discussed in the corresponding Argument sections below.

## SUMMARY OF ARGUMENT

I.   The evidence was more than sufficient to support Diaz-Colon's convictions.

First, a rational jury could find that Diaz-Colon attempted to commit Hobbs Act extortion, in violation of 18 U.S.C. § 1951. Diaz-Colon threatened Maceira and other officials with reputational harm through the release of damaging chat messages and public attacks unless Maceira paid hundreds of thousands of dollars and obtained the renewal of government contracts benefitting Diaz-Colon. Given Diaz-Colon's statements to Maceira and influence in the media, Maceira reasonably feared for his professional reputation, employment, and livelihood. Diaz-Colon not only sent Maceira a threatening Telegram message, but he also met with Maceira twice to explain the threatened harm and the price for making it go away. Diaz-Colon's month-long conduct was a substantial step toward completing the extortion offense and revealed his extortionate intent.

Alternatively, given Diaz-Colon's statements to Maceira about Maldonado-Nieves's conduct, and the messages to Maldonado-Nieves retrieved from Diaz-Colon's phone, a rational jury could conclude that Diaz-Colon aided and abetted Maldonado-Nieves's attempt to extort Maceira.

Second, a rational jury could find that Diaz-Colon sent an interstate communication containing a threat of reputational harm with the intent to extort Maceira, in violation of 18 U.S.C. § 875(d), and, alternatively, that he aided and abetted this offense. The June 20 Telegram message contained a true threat in asserting that certain evidence would destroy Maceira and other administration officials, and Diaz-Colon's follow-on demands for money and government-contract assistance evidenced his extortionate intent. Contrary to Diaz-Colon's arguments, the First Amendment does not protect extortionate speech, and the statute does not require that the communication with the true threat itself contain a demand for a thing of value.

Third, a rational jury could find that Diaz-Colon deleted his Telegram communications with Maceira with the intent to obstruct or impede a federal investigation, in violation of 18 U.S.C. § 1519. FBI Special Agent Lopez testified that Diaz-Colon visibly manipulated his phone when the agents interviewed him on July 26, 2019, while Maceira testified that Diaz-Colon erased all of their Telegram messages during the course of that day. That testimony was supported

by the screenshot of Maceira's phone, taken the night of July 26, showing the empty folder of his Telegram communications with Diaz-Colon and an indication that Diaz-Colon had last been active on Telegram when the FBI agents were still at his home.

II. The evidence did not prejudicially vary from the conduct alleged in Count One of the indictment. Rather, the evidence tracked the indictment's allegations concerning Diaz-Colon's extortionate scheme, including his communications and meetings with Maceira. Contrary to Diaz-Colon's assertion, the indictment did not allege that the $300,000 was ultimately for the benefit of Maldonado-Nieves. Even if the indictment were read in this manner, the evidence that Diaz-Colon owed money on his mortgage and car lease, and that he stood to benefit from the government contracts for which he sought assistance, did not create a material difference with the indictment that prejudiced Diaz-Colon.

III. The government did not suborn perjury from grand jury and trial witnesses or violate its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). As to the former, Diaz-Colon erroneously assumes that perjury occurred—and that the government sponsored it—simply because witnesses' recollections about an event may have varied or because he disagrees with their testimony. As to the latter, the government complied with its *Brady* obligations by

producing, more than 19 months before trial, the recording of Maceira's meeting at Musa with Diaz-Colon; Diaz-Colon speculates that an enhanced recording, transcript, and translation must exist, but the record indicates they do not. Nor did the government mislead Diaz-Colon about the audibility of the Musa recording that the defense possessed long before trial. The district court appropriately found that Diaz-Colon's misconduct allegations were frivolous.

IV. The district court did not violate Diaz-Colon's confrontation right or abuse its discretion in limiting his cross examination of Agent Lopez or Maceira in five areas. The court reasonably precluded the defense from introducing inadmissible hearsay statements of Maldonado-Nieves through Agent Lopez and, as to Maceira, reasonably precluded the defense from exceeding the scope of proper impeachment on collateral matters. In any event, those reasonable limitations on cross-examination did not prejudice Diaz-Colon.

V. The district court did not commit reversible error when instructing the jury. First, it correctly instructed that an attempt to commit extortion requires a substantial step toward completing the offense and more than mere preparation; Diaz-Colon's other requested instructions on attempt were either unnecessary or legally incorrect. Second, the court correctly declined to instruct the jury that it could not consider Diaz-Colon's extortionate demand for the renewal of government contracts in connection with Count One; the contracts, and

payments to be made thereunder, satisfy the obtaining-of-property element under the Hobbs Act. Third, the court correctly instructed the jury on aiding-and-abetting liability as to Count One; the indictment charged, and the evidence proved, this basis for liability. Fourth, the court correctly instructed the jury on the wrongfulness element of extortion on Count One; any error in omitting an instruction on wrongfulness as to Count Two was harmless in light of the evidence and the jury's verdict on Count One. Fifth, the court correctly rejected Diaz-Colon's request for an instruction to disregard language in a sub-heading of the indictment in connection with Counts Two and Three; that language did not inject an impermissible attempt theory into the latter counts.

## ARGUMENT

### I. THE EVIDENCE AMPLY SUPPORTS DIAZ-COLON'S CONVICTIONS.

Diaz-Colon challenges (Br. 35-69, 88-90) the sufficiency of the evidence on every element of every count of conviction. His arguments are inconsistent with the applicable standard of review and the substantial evidence of guilt presented at trial.[4]

---

[4] Although Diaz-Colon challenges the sufficiency of the evidence "on every element of the substantive offenses," Br. 39, his brief does not address every element, omitting, for example, analysis of the evidence proving the jurisdictional element of each offense. Where Diaz-Colon fails to address an element, or makes only a perfunctory argument about an element, the Court should treat as waived his sufficiency challenge to that element. *See United States*

## A.    Background

Diaz-Colon moved for a judgment of acquittal at the close of the government's case. App.955-75, 988-90; *see* Fed. R. Crim. P. 29(a). The district court orally denied that motion. App.992-95. Diaz-Colon renewed his motion after trial; the court denied that motion in a written ruling. D.E. 418; *see* S-Suppl-App.1104-29.

As to Count One, the court found that Diaz-Colon's June 20 Telegram message and his statements to Maceira at Musa and Il Postino "constitute[d] powerful evidence of Hobbs Act extortion," and that Maceira's testimony that he felt scared, frightened, and concerned for his employment after receiving the June 20 message "satisf[ied] the fear element" of attempted extortion. S-Suppl-App.1118-19. The court found it unnecessary to resolve Diaz-Colon's challenge to whether the Collective Impact and Social Consulting contracts were "transferable" property for Hobbs Act purposes, because Diaz-Colon had "repeatedly demanded that Maceira pay $300,000," which indisputably

---

*v. Vázquez-Rosario*, 45 F.4th 565, 571 n.7 (1st Cir. 2022); *United States v. Del Valle-Cruz*, 785 F.3d 48, 54 (1st Cir. 2015).

Similarly, Diaz-Colon may not incorporate by reference arguments made in his post-trial motion for judgment of acquittal and a new trial. *See* Br. 90-91. To the extent his post-trial motion presented arguments not contained in his opening brief, those arguments are also waived. *See United States v. Paz-Alvarez*, 799 F.3d 12, 31 (1st Cir. 2015).

qualified as property, "to prevent the release of Telegram messages in addition to the 889 pages that had already been leaked to the public." S-Suppl-App.1119.

As to Count Two, the court rejected Diaz-Colon's argument that his June 20 message to Maceira did not contain a threat for purposes of 18 U.S.C. § 875(d). S-Suppl-App.1120-21. The court concluded that "[a] reasonable person might find this message threatening." S-Suppl-App.1121.

As to Count Three, the court found sufficient evidence that Diaz-Colon sent Maceira a Telegram message on the day the FBI interviewed Diaz-Colon at his home and that Diaz-Colon erased the message before Maceira opened it and before the FBI executed the warrant for his phone. S-Suppl-App.1121-23.

## B.    Standard of Review

This Court reviews the sufficiency of the evidence supporting a jury verdict de novo, viewing "the trial evidence in the light most favorable to [the] jury's verdict." *United States v. Kanodia*, 943 F.3d 499, 505 (1st Cir. 2019). "Out of deference to the jury's role," the Court will overturn a guilty verdict only "where 'no rational jury could have found the defendant guilty beyond a reasonable doubt.'" *Id.* at 505-06 (quoting *United States v. McPhail*, 831 F.3d 1, 5 (1st Cir. 2016)). Disputes concerning witness credibility "are to be resolved in the verdict's favor." *United States v. Hatch*, 434 F.3d 1, 4 (1st Cir. 2006). The Court "need not believe that no verdict other than a guilty verdict could sensibly

be reached, but must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record." *United States v. Cruzado-Laureano*, 404 F.3d 470, 480 (1st Cir. 2005) (quotation marks omitted).

## C. The Evidence Proved That Diaz-Colon Attempted to Commit Extortion (Count One).

The evidence amply proved that Diaz-Colon attempted to extort hundreds of thousands of dollars and the renewal of government contracts from Maceira, and that he aided and abetted this offense.

### 1. Legal background

In relevant part, the Hobbs Act makes it a crime to "in any way or degree obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by … extortion," or to "attempt[] … to do so." 18 U.S.C. § 1951(a). Extortion is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or *fear*, or under color of official right." *Id.* § 1951(b)(2) (emphasis added).

Extortion by fear "encompasses fear of economic loss, including the loss of business opportunities." *United States v. DiDonna*, 866 F.3d 40, 46 (1st Cir. 2017) (quotation marks omitted); *see also United States v. Hathaway*, 534 F.2d 386, 395-96 (1st Cir. 1976) (loss of business contracts). Fear of economic loss also includes fear of losing employment and future job assignments. *See United States v. Daley*, 564 F.2d 645, 647-48, 650 (2d Cir. 1977). Establishing this fear does not

require proof that the defendant "actually issued" a threat of economic harm; the government's "burden is satisfied if it can show that the victim believed that economic loss would result from his or her failure to comply with the alleged extortionist's terms, and that the circumstances surrounding this conduct rendered that fear reasonable." *United States v. Bucci*, 839 F.2d 825, 828 (1st Cir. 1998); *accord, e.g.*, *DiDonna*, 866 F.3d at 46; *United States v. Cruz-Arroyo*, 461 F.3d 69, 74-75 (1st Cir. 2006).

The elements of an extortion offense are that (1) "the defendant induced someone to part with property"; (2) "the defendant knowingly and willfully did so by extortionate means" (including fear); and (3) "the extortionate transaction affected interstate commerce." *Cruzado-Laureano*, 404 F.3d at 480-81. To prove attempt, the government must establish "both an intent to commit the substantive offense and a substantial step towards its commission." *United States v. Turner*, 501 F.3d 59, 68 (1st Cir. 2007) (quotation marks omitted); *accord United States v. Pérez-Rodríguez*, 13 F.4th 1, 13 (1st Cir. 2021). "While 'mere preparation' does not constitute a substantial step, a defendant 'does not have to get very far along the line toward ultimate commission of the object crime in order to commit the attempt offense.'" *Turner*, 501 F.3d at 68 (quoting *United States v. Doyon*, 194 F.3d 207, 211 (1st Cir. 1999)). To prove aiding and abetting, the government must establish that (1) the substantive offense was committed by

someone; (2) "the defendant assisted in the commission of that crime or caused it to be committed"; and (3) "the defendant intended to assist in the commission of that crime or to cause it to be committed." *United States v. Gaw*, 817 F.3d 1, 7 (1st Cir. 2016) (quotation marks omitted); *see also Rosemond v. United States*, 572 U.S. 65, 77 (2014) (aider or abettor must "actively participate[] in a criminal venture with full knowledge of the circumstances constituting the charged offense").

2.     <u>The evidence was sufficient.</u>

a. The evidence proved that Diaz-Colon attempted to extort property from Maceira through fear.

First, Diaz-Colon took a substantial step toward committing this offense by repeatedly threatening Maceira (and through Maceira, other members of the Rosselló administration) with professional harm in order to obtain hundreds of thousands of dollars and government-contract assistance. In his secret Telegram message of June 20, 2019, Diaz-Colon told Maceira that Maldonado-Nieves had singled out "you and Fortaleza a[s] the ones who are behind this firepower against Raul Maldonado." Suppl-App.125. Diaz-Colon also asserted that Maldonado-Nieves "HAS STRONG EVIDENCE TO F*CK THIS ADMINISTRATION" and "IS GOING TO DETROY YOU ALL AT OTHER LEVELS." Suppl-App.125. The evidence was so damaging that Diaz-

Colon predicted that another party would "BE IN POWER FOR 30 YEARS." *Id.* Yet Diaz-Colon did not initially reveal what the damaging evidence was, which arguably enhanced the threat. App.295-97.

Diaz-Colon amplified this threat when meeting with Maceira at both Musa (on June 21) and Il Postino (on July 16). At Musa, Diaz-Colon revealed that Maldonado-Nieves had a binder of offensive and politically damaging chat messages that would destroy administration officials if released, and he described the contents of certain messages for Maceira. App.305-06, 309. Diaz-Colon again focused on the potential harm to Maceira; he warned that Maldonado-Nieves might have information about unspecified misconduct committed by Maceira at the Ports Authority and reiterated that Maldonado-Nieves blamed Maceira for the public attacks on Maldonado. App.309-10. At the Il Postino meeting, which followed the publication of 889 pages of chat messages, Diaz-Colon told Maceira that Maldonado-Nieves was going to release more damaging messages, while generally conveying that Maldonado-Nieves was dangerous and out of control. Suppl-App.81-84; App.428-49, 436-37; *see* Suppl-App.82 (Maldonado-Nieves's "threatening strategy" was "to make everyone sh*t their pants"); Suppl-App.84 (Maldonado-Nieves was acting "[a]s if this were the [ ] Corleone Mafia"). Diaz-Colon's statements at Musa and Il Postino enhanced the threat first issued in his Telegram message of June 20.

Diaz-Colon also named the price for preventing the release of chat messages and preventing public attacks on Maceira and the administration, principally, the payment of hundreds of thousands of dollars. *See, e.g.*, *United States v. Berk*, 652 F.3d 132, 140 (1st Cir. 2011) (concluding in child enticement case "that actually meeting with" the child's father to discuss "prices" and "graphic sexual details" went "far beyond 'mere preparation'" and was a substantial step). At Il Postino, for example, Diaz-Colon guaranteed that additional messages would not be released and that Maldonado-Nieves would not attack Maceira if Maceira paid $300,000 through Diaz-Colon (or a company Diaz-Colon could access). Suppl-App.83-84, 96-98, 101, 119; App.474. Diaz-Colon also promised that he could dial back the negative coverage on the administration if Maceira or the administration paid tens of thousands of dollars to media influencers whom Diaz-Colon controlled. Suppl-App. 94-96, 98-102, 119; App.458-62, 475-78; *see also* Suppl-App.85-90, 104, 109-10, 120 (Diaz-Colon agreed to help the administration in exchange for assistance with renewal of two government contracts from which he received retainers). And although Diaz-Colon feigned concern and protest over Maldonado-Nieves's extortionate threats, Maceira saw through his charade. App.305-06; Suppl-App.60, 72, 118. In Maceira's words, Diaz-Colon acted "like a gangster" by apologizing for Maldonado-Nieves's threats while stressing his own power and ability to prevent

the destruction of Maceira and other administration officials if his demands were met. App.306-08; *accord* App.494-95; *see also* App.414-15 (Diaz-Colon was simultaneously "lighting the fire" while "offering to become the firefighter … in exchange for money").

Diaz-Colon's conduct made Maceira fear economic loss. It left him scared and concerned about the potential damage to, among other things, his career and professional reputation if Diaz-Colon's demands were not met. App.297, 303, 501, 515-16. As Public Affairs Secretary, Maceira was the "face of the Government," and Diaz-Colon said that Maldonado-Nieves wanted to exact retribution on Maceira for his father's treatment. App.303, 308-09. Maceira was concerned that the release of chat messages or allegations about his (unspecified) misconduct at the Ports Authority would cause him to lose his job and hurt his ability to find post-government employment, in particular by interfering with his plans to work as an attorney in private practice. App.515-16. As discussed, inducing a fear of lost employment or lost business opportunities is cognizable under the Hobbs Act. *See* pp. 24-25, *supra*.

Maceira's fear was also reasonable. *See DiDonna*, 866 F.3d at 46. Diaz-Colon was an influential radio and television producer. App.303. At Musa, Diaz-Colon told Maceira that he was sitting next to Maldonado-Neives when he (Diaz-Colon) sent Maceira the threatening message, and Diaz-Colon referred

to the specific content of certain messages when predicting that their release would destroy the administration. App.305-06, 308-09. Diaz-Colon also emphasized his years of experience in communications, referenced influential people who had come to him when they needed gossip turned into scandals, and listed the names of influential media figures (some with their own talk shows) whom he purportedly controlled. App.307, 314, 317-18; *see United States v. Rivera Rangel*, 396 F.3d 476, 483-84 (1st Cir. 2005) (contractor reasonably feared that failure to make payments to the defendant would cause him economic harm given the defendant's "access to, and influence over, the officials who decided to grant the permits [the contractor] needed"). Diaz-Colon thus gave Maceira reason to believe that he had access to damaging information about the administration and the means to use it in a manner inflicting maximum harm. And the public protests and numerous resignations that followed the publication of chat messages on July 13, 2019, *see* App.341, 343, 407, 503-04, underscored the reasonableness of Maceira's fear. The jury reasonably concluded that Diaz-Colon took a substantial step toward extorting Maceira by fear.

Second, the evidence proved Diaz-Colon's intent to commit extortion, as reflected foremost in his communications with Maceira. At Musa, Diaz-Colon did not back down when Maceira told him that he viewed the June 20 message as a threat; after purporting to apologize, Diaz-Colon said that the materials

would destroy the administration and pressed forward with demands for $300,000, renewal of government contracts, and advertising dollars for Nación Z (in exchange for an administration-friendly news segment). App.305-06; pp. 6-7, *supra*. At Il Postino, Diaz-Colon acknowledged that Maldonado-Nieves's threat to release messages absent the $300,000 payment was extortionate. Suppl-App.60, 72, 118; App.410, 463. But again, he pressed on with demands for the $300,000, contract assistance, and payments to media influencers Diaz-Colon controlled.

Diaz-Colon's use of threats to obtain property was wrongful; he had no "claim of right" to the money he was demanding. *United States v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989); *accord United States v. Pendergraft*, 297 F.3d 1198, 1205 (11th Cir. 2002); *United States v. Nell*, 570 F.2d 1251, 1258 (5th Cir. 1978); *see generally United States v. Enmons*, 410 U.S. 396, 399-400 (1973). And Diaz-Colon knew that his conduct was wrongful. For example, he used secret Telegram messages to communicate with Maceira, including to transmit the original June 20 threat, and deleted an incriminating Telegram conversation thread with Maceira when later being interviewed by law enforcement. *See United States v. Gonsalves*, 668 F.2d 73, 75 (1st Cir. 1982) (equating the destruction of incriminating evidence with other conduct showing consciousness of guilt). He also chose Il Postino as a meeting place on July 16 because it would be less

crowded and open than the restaurant Maceira suggested, and he spoke in a lowered voice when pressing his extortionate demands. App.353-60, 374; *see* Suppl-App.130 (Telegram message from Diaz-Colon to Maceira: "We'll meet whenever you say in a private place to avoid unnecessary issues."). The trial record is replete with evidence that Diaz-Colon intended to extort Maceira.

Finally, Diaz-Colon's extortionate conduct presented a "realistic probability" of having a de minimis effect on interstate commerce. *Rivera Rangel*, 396 F.3d at 482 (quotation marks omitted); *see also* 18 U.S.C. § 1951(b)(3) (definition of "commerce"). Diaz-Colon's Telegram communications with Maceira traveled outside Puerto Rico, through servers located in foreign countries. App.631-32, 660-63; *see United States v. Mitov*, 460 F.3d 901, 909 (7th Cir. 2006) (money wired to defendant's relative in Luxembourg sufficient to satisfy interstate-commerce requirement). His threatening conduct also caused Maceira to travel to Florida to seek advice from a former law-enforcement official, App.321-24, and interfered with Maceira's official responsibilities, including his end-of-fiscal-year work at the Ports Authority, which owned and oversaw cargo piers, cruise passenger piers, and airports in Puerto Rico and contracted with companies outside Puerto Rico, App.259-64, 517-18.

ii. Because the evidence sufficiently proved that Diaz-Colon attempted to extort Maceira, the Court need not consider whether it also sufficiently

supported his conviction under an alternative aiding-and-abetting theory. *See Griffin v. United States*, 502 U.S. 46, 56-60 (1991); *United States v. Walker*, 99 F.3d 439, 442 (D.C. Cir. 1996). But here too, the evidence was sufficient.[5]

First, a rational jury could conclude that Maldonado-Nieves committed the substantive offense of attempted extortion based on Diaz-Colon's statements at Musa and Il Postino concerning Maldonado-Nieves, including that Maldonado-Nieves was angry about the political attacks on his father and was sitting next to Diaz-Colon when Diaz-Colon sent the June 20 message. App.305-06. It could also rely on the messages between Diaz-Colon and Maldonado-Nieves recovered from Diaz-Colon's phone, App.876-81; Suppl-App.466-530, including Diaz-Colon's message to Maldonado-Nieves the day after meeting Maceira at Musa: "Bro, as I told you in the afternoon, nothing has happened yet. The gasoline is still in the container. … We are moving forward," Suppl-App.491. And a rational jury could find that Diaz-Colon intended to assist, and did assist, Maldonado-Nieves's extortion attempt based on all the evidence, discussed *supra*, that Diaz-Colon delivered the extortionate threats and demands to Maceira and took steps to cover them up.

---

[5] As explained *infra* (pp. 107-08), the district court properly instructed the jury on an aiding-and-abetting theory of liability.

3. <u>Diaz-Colon's arguments lack merit.</u>

    a. *Diaz-Colon relies improperly on material outside the trial record.*

As a threshold matter, Diaz-Colon improperly relies on material outside the trial record in challenging the sufficiency of the evidence. He does this by cross-referencing paragraphs in his Statement of Facts (SOF) that cite discovery materials submitted as exhibits to pre-trial (D.E. 103) and post-trial (D.E. 384) motions—materials which were not introduced into evidence at trial. *See* Br. 46 (citing SOF ¶ v), Br. 55 (citing SOF ¶ e), Br. 56 (citing SOF ¶¶ q, v), Br. 57 (citing SOF ¶¶ w, aa). For example, he discusses his recorded telephone conversation with Maldonado-Nieves on July 26, cross-referencing an earlier portion of his brief that cites a transcript of the recorded call. Br. 46 (citing SOF ¶ v, which cites S-Suppl-App. 65-77). But neither the July 26 recording nor the recording transcript, which was filed as an exhibit to Diaz-Colon's pre-trial motion to dismiss (D.E. 103), was admitted into evidence. In fact, the court sustained the government's hearsay objection to admitting Diaz-Colon's conversation with Maldonado-Nieves through a testifying FBI agent. App.893-900, 922-26. Because appellate courts assess sufficiency claims only by reference to "evidence that was *actually presented* to the jury," *United States v. Staggers*, 961 F.3d 745, 756 (5th Cir. 2020) (emphasis added) (citing *Musacchio v. United States*, 577 U.S. 237,

244 (2016)), this Court should disregard Diaz-Colon's citation to materials outside the trial record in connection with his sufficiency claim.

> b. *The evidence amply proved that Diaz-Colon took a substantial step toward committing extortion.*

i. Diaz-Colon's primary argument is that he did not commit attempted extortion because the record allegedly shows only that he had a conversation with Maceira in which he passed along Maldonado-Nieves's demand for $300,000 in exchange for not releasing chat messages. Br. 45, 51. But communicating a monetary demand to the victim—and the consequences of not complying with it—is itself a substantial step toward committing extortion by economic fear. *See United States v. Marsh*, 26 F.3d 1496, 1500-02 (9th Cir. 1994) (defendant left voice messages for victim threatening to reveal information to victim's customers and employer unless payment made). It is of no moment, therefore, that Maceira and the FBI did not go forward with a plan to make a $20,000 partial payment to Diaz-Colon to see if he would accept it. Br. 45, 52; *see* App.502-04, 563 (Maceira testimony that he felt uncomfortable making the payment and did not believe Diaz-Colon would accept it because the amount was too low).

In any event, Diaz-Colon did more than have a brief conversation with Maceira. Over a one-month period, he sent Maceira a secret Telegram message threatening him and others with professional harm; held lengthy meetings with

Maceira at two restaurants, where he discussed the chat messages, his demands (including how to make the $300,000 payment), and the consequences of non-compliance; messaged Maceira in between meetings to remind him of their "pending" conversation (App.346-47); and responded to a post-Il Postino communication from Maceira with the message "ONWARDS AND UPWARDS" and "HITTING HARD WITHOUT FEAR" (Suppl-App.136). A rational jury could conclude that Diaz-Colon's conduct cleared the substantial-step threshold, which does not require "get[ting] very far along the line" toward committing the offense. *Turner,* 501 F.3d at 68 (quotation marks omitted); *see, e.g.*, *Pérez-Rodríguez*, 13 F.4th at 15 (substantial step toward child-enticement offense where defendant communicated and met with adult intermediary); *United States v. Temkin*, 797 F.3d 682, 690 (9th Cir. 2015) (substantial step toward extortion and murder offenses where defendant met with supposed hitman and gave him victims' information, bank details for transferring extorted money, and $3,000 in cash).[6]

Contrary to Diaz-Colon's argument, it does not matter whether it was Maceira who requested that he and Diaz-Colon meet at Musa and Il Postino.

---

[6] Diaz-Colon's cited cases (Br. 50-51) involve materially different facts and are inapposite. *See United States v. Joyce*, 693 F.2d 838, 841 (8th Cir. 1982) (defendant abandoned attempt to purchase cocaine); *United States v. Monholland*, 607 F.2d 1311, 1317-18 (10th Cir. 1979) (defendant engaged in only a "preliminary discussion" about the cost of explosive materials).

Br. 52. The key facts are that Diaz-Colon met with Maceira and, on both occasions, explained the threat to Maceira and the conditions for making it go away. Moreover, the jury reasonably could conclude that Diaz-Colon's threatening Telegram message was designed to shock Maceira into following up with Diaz-Colon; indeed, Maceira testified that, because the message came from a radio and television producer, he was scared and "concerned about what we would be dealing with." App.303. Even if it was Maceira who actually requested the meetings, the evidence on Count One was sufficient.

> c. *The extortion scheme did not end with the leak of chat messages.*

Diaz-Colon errs in contending that the scheme was effectively over when Maldonado-Nieves released the chat messages in the first half of July 2019, because "the damage was already … complete." Br. 56. To begin with, Diaz-Colon committed a substantial step *before* the release of those messages by sending the threatening Telegram message and meeting with Maceira at Musa. In any event, a rational jury could find that Diaz-Colon engaged in a substantial step at Il Postino by leading Maceira to believe that Maldonado-Nieves possessed, and was willing to release, more damaging messages if Maceira did not make the $300,000 payment.

Nor is there any merit to Diaz-Colon's related argument that the evidence did not prove that he communicated with Maldonado-Nieves about the

$300,000 demand between July 13 and July 25 (the day before his recorded call to Maldonado-Nieves), *see* Br. 56, or allegedly at any point, *see* Br. 43. Even if Diaz-Colon acted alone, the evidence proved that he attempted to extort Maceira by causing Maceira reasonably to fear professional and economic harm unless he satisfied Diaz-Colon's demands.[7]

The jury was not required to credit Diaz-Colon's statements to Maceira purporting to apologize that his June 20 Telegram message appeared threatening and purporting to disagree with Maldonado-Nieves's extortionate demands. *See* Br. 55. As Maceira testified, Diaz-Colon was acting like a "gangster," App.306-07, and was "playing both sides; lighting the fire, but on the other side offering to become the firefighter … in exchange for money," App.414-15. That Diaz-Colon made demands beyond the $300,000 payment, which would benefit himself and his allies in the media, corroborated Maceira's testimony that Diaz-Colon was driving, or at least helping to execute, the extortion scheme.

---

[7] Diaz-Colon makes various allegations about the government's investigation, the timing of the indictment, and other matters that are outside the trial record and irrelevant to his sufficiency claim. *See* Br. 55-57 (citing, *inter alia*, paragraphs in Statement of Facts that cite discovery materials).

> d. *The property that Diaz-Colon attempted to extort—including renewed government contracts—was cognizable under the Hobbs Act.*

Diaz-Colon attacks the evidence supporting Count One on the ground that the government contracts he attempted to extort were not obtainable "property" under the Hobbs Act, 18 U.S.C. § 1951(b)(2), because they were not transferable, citing *Sekhar v. United States*, 570 U.S. 729 (2013). Br. 25, 48, 54; *see also* Br. 124 (challenging jury instructions based on *Sekhar*). His argument misapplies that precedent and the record in this case.

To begin, the Court need not reach this sufficiency argument because Diaz-Colon does not dispute that an extortionate demand for monetary payments, including the $300,000 demand in this case, targets obtainable property under the Hobbs Act. *See, e.g.*, *United States v. Buffis*, 867 F.3d 230, 234 (1st Cir. 2017) ($4,000 check payment supported extortion conviction). The district court correctly concluded that, because the evidence sufficiently proved Diaz-Colon's attempt to extort this property from Maceira, his challenge to the government contracts is inconsequential. S-Suppl-App.1119.

In any event, *Sekhar* does not help Diaz-Colon. In that case, the defendant was convicted of attempted Hobbs Act extortion for trying to force the general counsel for the New York State Comptroller to recommend investing in a fund that the defendant's company managed by threatening to reveal the general

counsel's extramarital affair. 570 U.S. at 731. Focusing on the "obtaining of property" language in 18 U.S.C. § 1951(b)(2), the Court stated that "[t]he property extorted must [ ] be transferable—that is, capable of passing from one person to another." *Id.* at 734 (emphasis omitted). Based on the jury's verdict form, the Court identified the relevant property right as the general counsel's "recommendation" to the Comptroller "to approve" the investment. *Id.* at 737 (quotation marks omitted). The Court concluded that, even though the defendant could deprive the general counsel of this right, he could not plausibly have obtained it for himself. *Id.* at 737-38; *see id.* at 737 ("[A]n employee's yet-to-be-issued recommendation [cannot] be called obtainable property, [ ] less so still a yet-to-be-issued recommendation that would merely approve (but not effect) a particular investment."). Because the property was not transferable, the Court reversed the defendant's conviction. *Id.* at 737-38.

The property here is materially different than the government lawyer's work-related recommendation in *Sekhar*. Through fear, Diaz-Colon tried to force Maceira and the administration to renew two government contracts for services. The property he targeted was the money that would be paid to Collective Impact and Social Consulting under those contracts—money from which he expected to get a cut in the form of monthly retainers. Those monetary payments were transferable; they are akin to wages and benefits an employer

40

must pay to union members under extortion-induced labor agreements. *See, e.g.*, *United States v. Kirsch*, 903 F.3d 213, 227-28 (2d Cir. 2018) ("Indeed, when an employer pays wages and provides benefits to an employee, the employer 'part[s] with' that property, and the employee 'gain[s] possession' of it.") (quoting *Sekhar*, 570 U.S. at 734).

In *United States v. Brissette*, 919 F.3d 670 (1st Cir. 2019), this Court reversed the dismissal of a Hobbs Act extortion indictment, which charged city officials with threatening to withhold permits for a musical festival from a production company unless the company agreed to hire additional workers from a specific union to work at the event. *Id.* at 672, 676-80. The Court held that the directing of property to a third party, regardless of whether the alleged extortionist personally benefits from the directed transfer, constitutes "obtaining" that "property" under § 1951(b)(2). *Id.* at 676-80; *accord United States v. Valentini*, 944 F.3d 343, 350 (1st Cir. 2019) ("[D]irecting the transfer of property to a third party is enough."). In doing so, the Court rejected several *Sekhar*-based challenges to the charged extortion scheme and held that money paid to workers for labor performed under the extortion-induced arrangement would satisfy the Hobbs Act's obtaining-of-property element. *See Brissette,* 919 F.3d at 676-84. Likewise, here, payment to Collective Impact and Social Consulting under contracts that Diaz-Colon attempted to extort by fear was transferable property.

Diaz-Colon's reliance on *United States v. Burhoe*, 871 F.3d 1 (1st Cir. 2017), is misplaced. Br. 48. The "obtaining of property" alleged there was (1) wages and benefits for work that was taken away from particular union members and given to other members, and (2) foregone wages and benefits caused by the forced relinquishment of certain union members' seniority protections. 871 F.3d at 26. Both are factually distinguishable from the government contract payments in this case. In any event, the Court in *Burhoe* recognized that the first (and most comparable) scenario "could potentially be an 'obtaining of property'" but found it unnecessary to resolve the question given other issues in the case. *Brissette*, 919 F.3d at 679 (citing *Burhoe*, 871 F.3d at 27-28).

Maceira's testimony on cross-examination does not support Diaz-Colon's *Sekhar*-based challenge. *See* Br. 54. The defense asked Maceira whether he had "any power" to "[m]ake a transfer of the contracts to somebody else," to which Maceira answered, "No." App.616. Whether Maceira had the power to transfer the contracts to other companies does not speak to the issue in *Sekhar*. The renewed contracts clearly could be awarded to Collective Impact and Social Consulting. This would result in the payment of money from the government to those companies, which satisfies the obtaining-of-property element under § 1951(b)(2).

**D. The Evidence Proved That Diaz-Colon Committed Extortion by Interstate Communication of a Threat (Count Two).**

      1.   <u>Legal background</u>

The elements of an offense under 18 U.S.C. § 875(d) are that the defendant (1) knowingly transmitted in interstate or foreign commerce a communication containing a true threat to injure the reputation of another person, (2) with the intent to extort money or something else of value from another. *See* App.1017-19 (jury instructions). A "true threat" is "one that a reasonable recipient familiar with the context of the communication would find threatening." *United States v. Nishnianidze*, 342 F.3d 6, 14-15 (1st Cir. 2003).

For the purpose of this appeal, the government assumes that, as two courts of appeals have held, the "intent to extort" language in § 875(d) incorporates "the traditional concept of extortion, which includes an element of wrongfulness." *United States v. Jackson*, 180 F.3d 55, 70-71 (2d Cir. 1999); *accord United States v. Coss*, 677 F.3d 278, 285 (6th Cir. 2012) ("Congress linked the statute to the broader concept of extortion, which carries with it the use of a *wrongful* threat to procure something of value.") (emphasis in original); *see also United States v. Hobgood*, 868 F.3d 744, 748 (8th Cir. 2017) (assuming for decisional purposes that a threat must be "wrongful" under § 875(d)); *United States v. White*, 810 F.3d 212, 223 (4th Cir. 2016) (agreeing with *Jackson* and *Coss* and interpreting 18 U.S.C. § 875(b) to contain a wrongfulness element). Under

43

§ 875(d), an interstate communication of a threat with intent to extort is "wrongful" where the threatener seeks money or property to which he "does not have, and cannot reasonably believe [he] has, a claim of right, or where the threat has no nexus to a plausible claim of right." *Jackson*, 180 F.3d at 71; *accord Coss*, 677 F.3d at 286-88; *United States v. Avenatti*, 81 F.4th 171, 186 (2d Cir. 2023), *petition for cert. filed*, No. 23-6753 (Feb. 12, 2024).

### 2. The evidence was sufficient.

The evidence amply proved that Diaz-Colon violated § 875(d).

First, Diaz-Colon's Telegram message of June 20, which traveled in foreign commerce, contained a threat to the reputation of Maceira and other administration officials. Suppl-App.125. As discussed, Diaz-Colon told Maceira that Maldonado-Nieves had "STRONG EVIDENCE" that would "F*CK THIS ADMINISTRATION," blamed Maceira for the attacks on his father, and was going to "DESTROY" Maceira "AT ALL OTHER LEVELS." *Id.* This message was a true threat: it came from a known media figure; promised to destroy the addressee; predicted a fallout so severe that it would lead to 30 years of rule by another political party; and used capitalization and coarse language to underscore its urgency. *Id.*; *see United States v. Pascucci*, 943 F.2d 1032, 1036 (9th Cir. 1991) (jury determines the "existence of a threat" based "on the circumstances"). Second, Diaz-Colon's conduct after sending the message,

including his statements to Maceira at Musa and Il Postino, evidenced his intent to extort money and government contracts from Maceira. Finally, Diaz-Colon's conduct was wrongful because neither Diaz-Colon nor Maldonado-Nieves had a plausible claim of right to the money being demanded—and the threat to harm Maceira's reputation lacked a "nexus" to any such claim of right. *Jackson*, 180 F.3d at 71.

Alternatively, the evidence sufficiently proved that Diaz-Colon aided and abetted Maldonado-Nieves's commission of a § 875(d) offense. Diaz-Colon told Maceira that he sent the June 20 message while sitting next to Maldonado-Nieves; Diaz-Colon said that the chat messages he had been viewing was going to destroy the administration. App.305-06. Based on all the evidence, a rational jury could conclude that Maldonado-Nieves committed the substantive offense by directing the threatening communication to Maceira and that Diaz-Colon assisted by typing and sending the message, intending that Maceira be extorted.

     3.    <u>Diaz-Colon's arguments lack merit.</u>

        *a.*    *Diaz-Colon's conduct was not protected by the First Amendment.*

Diaz-Colon erroneously contends that his June 20 communication did not contain a true threat, and therefore cannot support his conviction, because it was

political speech protected by the First Amendment. Br. 60-62.[8]

The "'freedom of speech' referred to by the First Amendment does not include a freedom to disregard … traditional limitations" on certain categories of speech. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992). Those categories of unprotected speech include speech that is "integral to criminal conduct." *United States v. Stevens*, 559 U.S. 460, 468 (2010); *see Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."); *United States v. Sayer*, 748 F.3d 425, 433-34 (1st Cir. 2014) (observing that speech integral to criminal conduct is unprotected in rejecting challenges to cyberstalking statute).

In this vein, the First Amendment does not protect extortionate speech. *See, e.g.*, *Sayer*, 748 F.3d at 434 (citing *United States v. Varani*, 435 F.2d 758, 762

---

[8] Apart from a passing sentence in his argument summary (Br. 23), Diaz-Colon limits his First Amendment challenge to Count Two (Br. 60-62). If the Court also considers it in the context of Count One, it fails for the same reasons applicable to Count Two.

The district court did not address Diaz-Colon's First Amendment arguments when denying his post-trial acquittal motion, S-Suppl-App.1120-21, but it previously addressed and rejected his First Amendment challenge to the indictment, S-Suppl-App.246.

(6th Cir. 1970)); *Coss*, 677 F.3d at 289; *United States v. Bly*, 510 F.3d 453, 458 (4th Cir. 2007); *United States v. Hutson*, 843 F.2d 1232, 1235 (9th Cir. 1988); *United States v. Quinn*, 514 F.2d 1250, 1268 (5th Cir. 1975). Significantly, the Sixth Circuit has held that 18 U.S.C. § 875(d) "criminalizes, in a clear and precise manner, extortionate threats, which are true threats, and therefore not protected speech." *Coss*, 677 F.3d at 289. The court reasoned that § 875(d) is "significantly more circumscribed" than a general threats statute insofar as it "requires both that the threat be wrongful and that it be made in conjunction with the specific intent to extort," and that the specific-intent requirement "ensures that its application is sufficiently constrained to reach only nonprotected speech." *Id.* at 290. Likewise, the Ninth Circuit has rejected a First Amendment challenge to a neighboring statute, 18 U.S.C. § 876, that criminalizes mailing, with the intent to extort, a threat to harm the reputation of the addressee; the court reasoned that the "'intent to extort' requirement … guarantees that the statute reaches only extortionate speech, which is undoubtedly within the government's power to prohibit." *Hutson*, 843 F.2d at 1235.

The same analysis governs here. In his June 20 Telegram message, Diaz-Colon threatened Maceira with harm to his employment and professional reputation, intending to extort hundreds of thousands of dollars and government contracts—property to which Diaz-Colon had no plausible claim of right. And

he used Telegram's secret messaging platform to disseminate the threat. *See Bly*, 510 F.3d at 459 (rejecting argument that defendant's letter was protected political hyperbole, rather than a true threat, where it was "delivered privately to specific individuals"). This was speech in service of extortion, not protected activity.

Diaz-Colon is mistaken in arguing that his message was "legitimate political speech" that simply alerted Maceira to "potential political damage" to the Rosselló administration, Br. 62, and that "a threat to expose political corruption and misconduct cannot be considered a wrongful threat," Br. 63 (emphasis removed). A reasonable jury could find that the Telegram message was designed to shock Maceira with threats of evidence that would destroy him and other officials, laying the groundwork for Diaz-Colon's demands for money to which he had no lawful right. That Diaz-Colon was threatening to expose allegedly "truthful" information (Br. 63) is irrelevant; the "truth of damaging allegations underlying a threat to injure the reputation of another is no defense" to a § 875(d) violation. *United States v. Von der Linden*, 561 F.2d 1340, 1341 (9th Cir. 1977) (per curiam); *accord Keys v. United States*, 126 F.2d 181, 185 (8th Cir. 1942) (predecessor statute). And the evidence that Diaz-Colon acted with the intent to extort precludes finding a First Amendment violation. *See Coss*, 677 F.3d at 289-90; *Hutson*, 843 F.2d at 1235.

Diaz-Colon's reliance (Br. 61) on *Elonis v. United States*, 575 U.S. 723 (2015), and *Counterman v. Colorado*, 600 U.S. 66 (2023), is misplaced. In *Elonis*, the Court read a mens rea requirement into 18 U.S.C. § 875(c), which prohibits the interstate transmission of threats to kidnap or injure a person, but does not contain an intent-to-extort element. The Court concluded that "the crucial element separating legal innocence from wrongful conduct" under § 875(c) is the "threatening nature of the communication," and held that conviction under this provision requires a jury finding on the defendant's state of mind as to the threat. *Elonis*, 575 U.S. at 726, 737-40 (quotation marks omitted). In *Counterman*, involving a state statute that criminalized threats of violence, the Court held that the First Amendment "requires proof that the defendant had some subjective understanding of the threatening nature of his statements," but that "a mental state of recklessness is sufficient." 600 U.S. at 69.

Neither case helps Diaz-Colon. Conviction under § 875(d) requires, and the evidence here proved, a mens rea (intent to extort) that ensured Diaz-Colon knew the threatening nature of his June 20 message. Because "extortion only works if the victim fears that not paying will invite an unsavory result," one who intends to extort "must necessarily intend to instill fear of harm." *United States v. Killen*, 729 F. App'x 703, 712 (11th Cir. 2018) (unpublished) (brackets and quotation marks omitted). Under § 875(d), "it would be passing strange, indeed

impossible, for a defendant to intend to obtain something" by communicating a threat of reputational or property harm "without also intending, understanding, or, possibly, recklessly disregarding that the communication would be perceived as threatening." *Id.* (quotation marks omitted); *see also White*, 810 F.3d at 223 (so concluding as to § 875(b)).

> b. *Section 875(d) does not require that the threatening communication itself contain a demand for money or something else of value.*

Diaz-Colon's argument (Br. 63) that his June 20 message did not include a demand for money also fails. The statute requires that the defendant transmit a communication containing a "threat" of reputational or property harm with the "intent to extort … any money or other thing of value." 18 U.S.C. § 875(d). It does not state that a demand for something of value must be included in the threatening communication itself, or limit evidence of the defendant's extortionate intent to the contents of the communication.

Nor does the requirement that the threat be a "true threat"—one "that a reasonable recipient familiar with [its] context … would find threatening," *Nishnianidze*, 342 F.3d at 14-15—mean that a demand for money must appear in the same communication as the threat. As the Supreme Court explained in relation to "true threats" of violence, "[t]he 'true' in that term distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context

do not convey a real possibility that violence will follow." *Counterman*, 600 U.S. at 74. And here, a reasonable recipient of Diaz-Colon's June 20 message, who was familiar with Puerto Rico's media and political landscape, would find the message threatening given its tone, content, and author. Diaz-Colon's contention that his June 20 message does not satisfy the "objective" component of a true threat, Br. 64 (citing *Counterman*, 600 U.S. at 72), is meritless.

Congress had no reason to require in § 875(d) that the threatening communication itself contain a money or property demand. Diaz-Colon's sequencing of communications made his conduct no less harmful than if he had demanded money in his original Telegram message. The day after sending that message, Diaz-Colon explained the contours of the threat to Maceira and the price for making it go away. Diaz-Colon's initial withholding of information about his monetary demands posed no legal barrier to conviction under § 875(d).

### E. The Evidence Proved That Diaz-Colon Destroyed Records in a Federal Investigation (Count Three).

#### 1. Legal background

The elements of an offense under 18 U.S.C. § 1519 are that the defendant: (1) knowingly altered, destroyed, mutilated, concealed, covered up, or made a false entry in a record, document, or tangible object, (2) with the intent to impede, obstruct, or influence the investigation or proper administration of a matter, or in relation to or contemplation of such a matter, (3) that is within the

jurisdiction of a department or agency of the United States. *See* App.1018-19 (jury instructions). The government need not prove that the defendant knew his conduct would obstruct a federal investigation, or even that one would take place. *United States v. Scott*, 979 F.3d 986, 991-92 (2d Cir. 2020); *see also United States v. Scott*, 70 F.4th 846, 855 (5th Cir. 2023) (holding that § 1519 contains no materiality element).

### 2. The evidence was sufficient.

A rational jury could readily conclude that Diaz-Colon committed each offense element.

First, he knowingly destroyed a record or document by deleting his Telegram chat conversation with Maceira when meeting with the FBI. Special Agent Lopez testified that he and other FBI agents were at Diaz-Colon's residence from around 12:45 p.m. through around 5:40 p.m. on July 26, 2019. App.845, 848, 850. When the agents interviewed him, before they executed the warrant for his phone, Diaz-Colon "manipulate[d]" his phone at times. App.850. Agent Lopez further testified that, later the same night, Maceira informed him that Diaz-Colon had deleted their previous message conversations and sent Agent Lopez a screenshot from his phone indicating that the conversations had been deleted. App.851. The screenshot, taken at 8:09 p.m., showed an empty folder of Telegram chat messages with Diaz-Colon on

Maceira's phone and showed that Diaz-Colon had last been active on Telegram "4 hours ago," Suppl-App.144; *see* App.512-14, when the agents were still at his home.

Maceira confirmed that he sent the screenshot of his empty folder of Telegram messages with Diaz-Colon to Agent Lopez and testified that, earlier on July 26, he had received Telegram messages from Diaz-Colon but had been too busy to read them and only saw the banner notifications. App.504-05, 509-10. When he went to read them later that night, the messages had been erased, along with all of his other Telegram messages with Diaz-Colon. App.510-11. Maceira testified that Diaz-Colon must have erased the messages because no one else participated in their chats and Maceira did not erase them. App.510-11. The erased messages included Maceira's messages with Diaz-Colon coordinating their meeting at Il Postino, Diaz-Colon's message identifying the two companies for which he sought contract assistance, and messages alluding to their ongoing discussions. Suppl-App.130-39.

Based on all of this evidence, the jury reasonably could conclude that Diaz-Colon knowingly destroyed (or at least concealed) his Telegram messages with Maceira by deleting them while the FBI was at his home on July 26. *See United States v. Kernell*, 667 F.3d 746, 756-57 (6th Cir. 2012) (deletion of computer files satisfied first element of § 1519 offense); *United States v. Davis*, 855

F. App'x 362, 363-64 (9th Cir. 2021) (unpublished) (evidence that photograph of victim deleted from phone and "could not readily be recovered without the use of forensic tools" supported § 1519 conviction); *see also* App.666-67 (Telegram is not a U.S. company and does not comply with law enforcement requests).

Second, a reasonable jury could find that Diaz-Colon intended to impede or obstruct an investigation into the extortionate scheme perpetrated against Maceira, or at least that he acted "in contemplation of" such an investigation. The deleted messages were incriminating—they provided evidence of, among other things, the meeting at Il Postino and Diaz-Colon's demand for government-contract assistance. The timing of the deletion also mattered. The Telegram messages were up to ten days old, but Diaz-Colon deleted them only when the FBI showed up at his home and interviewed him. A rational jury could infer Diaz-Colon's criminal intent from this evidence. *See United States v. Hunt*, 526 F.3d 739, 745 (11th Cir. 2008) (evidence that the defendant-officer knew FBI investigated excessive-force claims supported his § 1519 conviction for making false statement in a police report); *United States v. Stover*, 499 F. App'x 267, 274 (4th Cir. 2012) (unpublished) (sufficient evidence of criminal intent under § 1519 where defendant was aware of the FBI's investigation and interest in records he ordered destroyed).

Finally, the extortionate scheme under investigation was a matter within the jurisdiction of the United States. *See* App.835-38, 1019.

### 3.     Diaz-Colon's arguments lack merit.

Diaz-Colon's contrary arguments are inconsistent with the record and standard of review.

> ####     a.     *The government's presentation of evidence identified the messages that Diaz-Colon deleted.*

Diaz-Colon contends (Br. 67-68) that the government failed to identify the messages he deleted. Not so. The government introduced, as Exhibit 9, Diaz-Colon's Telegram messages with Maceira between July 16 and July 19, Suppl-App.130-39, which Maceira identified, App.351, 489-90, 505-09. Maceira testified that Diaz-Colon erased all of their previous Telegram chat messages, "including the ones" he identified in Exhibit 9. App.510-11. Therefore, a rational jury could find that the deleted messages included those sent between July 16 and 19, which, again, referenced the Il Postino meeting, the companies Diaz-Colon identified for contract assistance, and Maceira's ongoing discussions with Diaz-Colon.

> ####     b.     *The jury properly credited Agent Lopez's testimony.*

Diaz-Colon alleges (Br. 68) that Agent Lopez's testimony that Diaz-Colon manipulated his phone during the July 26 interview was "incredible, implausible, and unbelievable"; he contends that Lopez would have prevented

him from manipulating his phone because the search warrant affidavit alleged that the phone contained evidence of criminal wrongdoing. This argument is meritless. Setting aside that the warrant affidavit is not part of the trial record, the fundamental flaw in Diaz-Colon's argument is that he asks this Court to substitute its own credibility determination for that of the jury. *See United States v. Carroll*, 105 F.3d 740, 743 (1st Cir. 1997) ("Credibility determinations are, of course, squarely within the jury's domain."). On sufficiency review, the Court does not "re-weigh the evidence or second-guess the jury's credibility determinations" and will uphold a guilty verdict as long as it "is supported by a plausible rendition of the record." *United States v. Ramirez-Frechel*, 23 F.4th 69, 73 (1st Cir.) (quotation marks omitted), *cert. denied*, 142 S. Ct. 2828 (2022). At a minimum, the record "plausibly" supports the jury's finding that Diaz-Colon deleted Telegram messages from his phone in the FBI's presence given the evidence corroborating Agent Lopez's testimony, namely, Maceira's testimony about Diaz-Colon's deletion of messages and the screenshot of Maceira's phone showing that Diaz-Colon was last active on Telegram when the FBI was still at his home.

> c.    *Diaz-Colon's consent to agents reviewing certain messages on his phone did not mitigate his criminal intent.*

Diaz-Colon also contends that he "had nothing to hide" because he allowed the agents to view messages on his phone before they executed the

warrant. Br. 68. But the jury was not required to draw that conclusion. *See United States v. Vázquez-Botet*, 532 F.3d 37, 60 (1st Cir. 2008) (a jury "is free to choose among reasonable interpretations of the evidence") (quotation marks omitted). Agent Lopez testified that he obtained consent from Diaz-Colon "to see certain text messages between him and Raul Maldonado-Nieves," not to review Telegram messages between Diaz-Colon and Maceira. App.918-20. The jury reasonably could conclude that Diaz-Colon was less worried about letting the agents review his communications with Maldonado-Nieves than his communications with Maceira, or that Diaz-Colon deleted his Telegram messages with Maceira by the time he let the agents see his phone.[9]

## II. THE DISTRICT COURT CORRECTLY DENIED DIAZ-COLON'S VARIANCE CLAIM.

Diaz-Colon contends (Br. 103-14) that a prejudicial variance occurred because the indictment purportedly alleged that the attempted extortion of $300,000 was for the benefit of Maldonado-Nieves but the trial evidence of his outstanding debts suggested, as an alternative theory, that the $300,000 was solely for Diaz-Colon's benefit. This argument is meritless.

---

[9] Diaz-Colon's parting missive, that the Court should dismiss Count Three if it finds the evidence insufficient on Counts One and Two (Br. 69), is meritless. He cites no authority holding that § 1519 requires proof that the destroyed or concealed records were evidence of a separate crime.

## A.    Background

The indictment alleged specific conduct related to Diaz-Colon's attempted extortion offense, including his threatening Telegram message and meetings with Maceira at Musa and Il Postino. App.46-48. The indictment contained no allegation that the property Diaz-Colon attempted to extort was for the benefit of Maldonado-Nieves. *See id.*

Agent Lopez testified that, when the FBI returned to Diaz-Colon's residence for the second time on July 26, 2019, Diaz-Colon said that he had instructed his wife not to answer the door when the agents previously approached because he believed that the agents were from the IRS, to which he owed money, or were coming to seize his property because he was delinquent on payments. App.848. When the government asked Agent Lopez whether the FBI later received information concerning Diaz-Colon's debts, the defense moved for a mistrial on the grounds that evidence suggesting that Diaz-Colon attempted to commit extortion in order to pay his debts, as well as previously admitted evidence that he received payments from the Social Consulting and Collective Impact contracts, created a prejudicial variance with the indictment. App.860-62. The district court denied his request for a mistrial. App.862. The government admitted through Agent Lopez evidence that Diaz-Colon was in

arrears on his mortgage loan and car lease by $8,014 and $1,134, respectively. App.873-75.

## B. Standard of Review

The Court reviews a preserved variance claim de novo, *United States v. Katana*, 93 F.4th 521, 530 (1st Cir. 2024), construing the indictment in "a plain and commonsense manner," *United States v. Martínez*, 994 F.3d 1, 13 (1st Cir. 2021) (quotation marks omitted).

## C. The Evidence Was Not at Fatal Variance with the Attempted Extortion Offense Charged in the Indictment.

To establish a variance, the defendant "must show a material factual difference between the crime charged in the indictment and the crime proved at trial." *United States v. Rodríguez-Milián*, 820 F.3d 26, 33 (1st Cir. 2016); *accord, e.g.*, *United States v. Escobar-de-Jesús*, 187 F.3d 148, 172 (1st Cir. 1999). But a variance is not prejudicial, and does not warrant reversal, if the "indictment provides the defendant with sufficient detail to allow him to prepare a defense, avoid unfair surprise at trial, and plead double jeopardy when appropriate." *Cruz-Arroyo*, 461 F.3d at 77; *accord Katana*, 93 F.4th at 530. Diaz-Colon cannot establish a prejudicial variance.

1. The evidence of Diaz-Colon's attempted extortion did not materially differ from the conduct charged in the indictment. Count One set forth "the nucleus of operative facts giving rise to" the attempted extortion charge. *Cruz-*

*Arroyo*, 461 F.3d at 77. Among other things, it identified and partially quoted Diaz-Colon's threatening Telegram message to Maceira, and it described their meeting at Musa the next day—including Diaz-Colon's statement that Maldonado-Nieves had a "binder full" of Telegram messages that would "destroy" the Governor and his close associates, and his request that Maceira "help him with several government contracts through which he received compensation." App.46. Count One also described Diaz-Colon's meeting with Maceira at Il Postino on July 16, including Diaz-Colon's statements that Maldonado-Nieves threatened to release additional, damaging messages "unless [Maldonado-Nieves] received approximately $300,000" (payable through Diaz-Colon), and that Maceira also needed to provide payments to media influencers and to "obtain the reinstatement" of government contracts from which Diaz-Colon benefitted. App.46-47; *see also* App.47 (alleging that Diaz-Colon sent Maceira Telegram message with names of contracting companies during the Il Postino meeting). Count One also described Maceira's expression of fear over the threatened release of information. App.47.

The trial evidence tracked and proved these allegations. That it supplied more factual detail did not create a variance; "[t]he law recognizes that the government need not lay out the whole of its proof in the indictment." *Cruz-Arroyo*, 461 F.3d at 77. Because the indictment gave "particular notice of the

events charged, and the proof at trial center[ed] on those events," any "minor differences" between the facts charged and the facts proven were not material. *United States v. Arcadipane*, 41 F.3d 1, 6 (1st Cir. 1994).

2. Diaz-Colon erroneously contends that the indictment alleged that the $300,000 payment was "for the benefit of" Madonado-Nieves, such that the evidence of his personal debts created a variance. Br. 105. That is not an accurate or commonsense reading of the indictment. Count One alleged that, at the July 16 meeting, Diaz-Colon told Maceira that Maldonado-Nieves "intended to 'burn down Puerto Rico' by releasing [additional] Telegram messages unless [Maldonado-Nieves] received approximately $300,000," and said that Diaz-Colon "would receive the payment on behalf of [Maldonado-Nieves] through a corporation" that Diaz-Colon "owned." App.47. That is what the evidence showed—the recording of the Il Postino meeting reflects that Diaz-Colon made those statements. *See* Suppl-App.53, 60, 83-84, 100-01. But the allegation that Diaz-Colon *said* Maldonado-Nieves was demanding $300,000 did not necessarily mean that the money would go to Maldonado-Nieves. Nor did the fact that it was Maldonado-Nieves, rather than Diaz-Colon, who purportedly possessed the chat messages, *see* Br. 31-32, preclude Diaz-Colon from engaging in the scheme for his own benefit. Because the indictment does not allege that the $300,000 would be for the actual benefit of Maldonado-Nieves, evidence

permitting the jury to infer that Diaz-Colon was going to keep some or all of it did not create a variance. *See United States v. Pungitore*, 910 F.2d 1084, 1136-37 (3d Cir. 1990) (rejecting variance claim concerning motive for extorting payments from victim where indictment did not specify motive for extortion).

Even if Diaz-Colon's characterization of the indictment were correct, the evidence did not differ from the indictment. The limited evidence of Diaz-Colon's personal debts helped explain why he also sought Maceira's assistance with the renewal of two government contracts from which, the indictment alleged, he benefitted. App.46-47.

In any event, motive is not an element of attempted extortion. Diaz-Colon is guilty of that offense whether the $300,000 was purely for the benefit of himself, a third party, or both. *See Valentini*, 944 F.3d at 350; *Brissette*, 919 F.3d at 676-80. Nor is motive an offense element under 18 U.S.C. § 875(d), to the extent that Diaz-Colon's claim can be construed to apply to Count Two. Thus, any differences between the indictment and the evidence concerning Diaz-Colon's reasons for extorting Maceira were not material. *See United States v. Greaux-Gomez*, 52 F.4th 426, 439 (1st Cir. 2022); *Escobar-de-Jesús*, 187 F.3d at 172.

3. Diaz-Colon appears to contend (Br. 111-14) that the evidence concerning his retainers under the Collective Impact and Social Consulting

contracts amounted to proof of uncharged crimes ("fraud and kickbacks") that separately created a variance or "amended" the indictment. *See generally Katana*, 93 F.4th at 530-31 (distinguishing variance and constructive amendment claims and explaining that the latter requires "show[ing] that the proceedings altered the indictment with respect to a statutory element of the offense") (quotation marks and brackets removed). Not so. Again, the indictment alleged that, as part of the extortion scheme, Diaz-Colon demanded assistance with government contracts from which he profited; the Collective Impact and Social Consulting evidence proved Diaz-Colon's link to the contracts. At Il Postino, Diaz-Colon himself stated that he received "a retainer [ ] for consulting" in connection with the contracts. Suppl-App.85-86. The evidence was relevant to his attempted extortion of Maceira, not an uncharged crime, and it did not affect the statutory elements of his offense.

4. Diaz-Colon contends that the district court improperly excluded proffered defense evidence concerning his consulting company. *See* Br. 113. But he does not explain how that alleged ruling supports his claim of a fatal variance. And the transcript pages cited by Diaz-Colon indicate that the district court did not make a definitive pretrial ruling on admissibility; it deferred ruling so that it could consider the evidence in the context of how the trial unfolded. *See* S-Suppl-

App.431-32. It does not appear that Diaz-Colon ever renewed his request to admit the evidence during trial, and he does not contend otherwise in his brief.

5. Finally, even if the evidence materially varied from the indictment, the variance was not prejudicial. Given the indictment's allegation that Diaz-Colon benefitted from the government contracts, he cannot claim unfair surprise over evidence permitting the inference that he was motivated by personal gain to extort Maceira. The indictment's detailed allegations concerning the threats and demands that Diaz-Colon made to further the extortion scheme, including the dates and content of his communications and meetings with Maceira, enabled Diaz-Colon to prepare an effective defense and, if ever necessary in the future, will allow him to plead double jeopardy. *See Katana*, 93 F.4th at 530. Reversal is not warranted.

## III. THE DISTRICT COURT CORRECTLY REJECTED DIAZ-COLON'S CLAIMS OF PROSECUTORIAL MISCONDUCT.

Diaz-Colon contends (Br. 69-88, 90-91) that the government suborned perjury in the grand jury and at trial and violated its *Brady* obligations, and that this alleged misconduct warrants dismissing the indictment or a new trial. These claims are meritless.

### A. Background

#### 1. Pretrial request related to Musa recording

In June 2021, more than 19 months before trial, the government provided the defense a copy of the recording of Diaz-Colon's June 21, 2019 meeting with Maceira at Musa (hereafter, the "Musa recording"). S-Suppl-App.836.

On January 14, 2023, only nine days before trial, defense counsel emailed the government asking whether it would provide him with a "transcript/translation" of the Musa recording. S-Suppl-App.837, 835. The government replied that, "[d]ue to the inaudibility of the recording," no transcript was made of it, and accordingly that the government did not possess a transcript or translation. S-Suppl-App.836. The government noted that, in full compliance with its discovery obligations, it had produced the Musa recording to the defense in a discovery production on June 3, 2021. *Id.*

On January 17, 2023, defense counsel emailed the government asking whether it had attempted to make an enhanced version of the Musa recording, and asking when and where the defense could meet to hear the Musa recording. S-Suppl-App.834. The government responded that "no enhancement was made" of the recording; directed counsel to the audio file of the Musa recording in the June 3, 2021 discovery production—an audio file that counsel would be able to review using almost "any commercially available digital audio player";

but offered counsel the opportunity to listen to the recording at the FBI's offices the next day. *Id.*

## 2. Relevant trial proceedings and testimony

a. During his opening statement, counsel for Diaz-Colon referred to specific statements Diaz-Colon allegedly made at Musa. App.176-77.

b. William Hinton, an electronics engineer with the FBI, testified that he enhanced the audio recording admitted as Government Exhibit 5—the recording of the July 16, 2019 meeting at Il Postino, App.383-84—but otherwise that he was not involved in this case. App.202-03, 209-10. On cross-examination, Hinton initially testified that he believed he had enhanced four recordings but did "not remember specifically." App.219. The defense informed the court that it had received in discovery an enhanced recording of only the July 16 meeting and, alluding to the Musa recording, stated that it was entitled to any other enhanced recordings that were made. App.221. In response to questioning by the court and counsel, Hinton testified that he believed he had received two pen drives with recordings, but that he did not know if the drives were different and could not remember if he had enhanced a recording other than the July 16 recording admitted as Exhibit 5. App.222-23.

c. Maceira testified that he recorded the June 21 meeting at Musa using his phone because he was concerned about the threat in Diaz-Colon's secret

Telegram message and, as a lawyer, knew that he needed evidence. App.302-04. He further testified that, at Musa, Diaz-Colon said that Maldonado-Nieves was asking for $300,000 in exchange for not releasing damaging chat messages, App.311-12, 317, and said multiple times that the material would destroy Maceira, App.305.

On cross-examination, Maceira testified that he turned over the Musa recording to the FBI; that he listened to the whole recording with the FBI at a later time; and that portions of the recording were audible and other portions were inaudible. App.539-40. Maceira also confirmed that Diaz-Colon had mentioned the $300,000 demand during the Musa meeting, but Maceira acknowledged that he did not testify to that fact in the grand jury. App.572-78.

Maceira separately testified that he told Governor Rosselló and Rosselló's chief of staff about Diaz-Colon's threatening Telegram message shortly after receiving it. App.297. After the meeting at Musa, Maceira told Rosselló that Diaz-Colon had said Maldonado-Nieves was asking for $300,000 in exchange for not releasing information "that could destroy [them]." App.560-61.

d. Agent Lopez testified on cross-examination that he had listened to the entire Musa recording and that the recording was audible. App.902-03. Agent Lopez did not know whether the government ever prepared a transcript or translation of the recording. App.903.

At sidebar, defense counsel maintained that the Musa recording was exculpatory and that the government had an obligation to transcribe and translate it. App.906. Counsel alleged that the government had previously maintained in an email that the recording had not been transcribed or translated because it was inaudible, but "[n]ow, it appears that the witness is saying that it was audible." App.907. Counsel noted that the defense had hired an expert in recording enhancements and was in the process of getting the Musa recording transcribed and translated. App.908.

Government counsel informed the court that the government had produced the Musa recording to the defense in June 2021 and that the defense had ample time to arrange for an expert to examine or testify about the recording. App.908-09. The government provided a discovery letter of June 3, 2021, memorializing its production of the Musa recording. App.911-12.

In response to defense counsel's argument that the government was obligated to provide a transcription and translation of the recording, the court stated, "The recording is the evidence. … If you want to use it, then it's your job to get it transcribed and translated. … [A]nd whether it includes Brady and Giglio, then it was produced in June 2021." App.912-13.

### 3. New-trial motion and ruling

After the verdict, Diaz-Colon filed a new-trial motion alleging that the government suborned perjury in the grand jury and at trial and that the government's purported representation to the defense before trial about the inaudibility of the Musa recording was false. S-Suppl-App.633-51. Diaz-Colon attached transcripts of the Musa recording (in Spanish and English), presumably prepared at the defense's direction, and repeatedly cited the transcripts in his motion. *E.g.*, S-Suppl-App.587, 634-35, 639, 643.

The district court found that Diaz-Colon's misconduct allegations were "[f]rivolous" and denied his new-trial motion. S-Suppl-App.1125-29. The court observed that Diaz-Colon "conflate[d] prosecutorial misconduct with commonplace evidentiary disputes and differences of opinion." S-Suppl-App.1125. The court explained that "[p]erjury is generally defined as the 'act or an instance of a person's deliberately making material false or misleading statements while under oath.'" S-Suppl-App.1126 (quoting Black's Law Dictionary 1321 (10th ed. 2014)). The court found that Diaz-Colon "misconstrue[d] this term" in asserting, for example, that the government had "suborned perjury based on inconsistent versions of facts provided by Maceira and Governor Rosselló" concerning whether Maceira informed Rosselló of Diaz-Colon's threatening Telegram message. S-Suppl-App.1126-27. "Witness

recollections vary, and conflicting evidence is offered at nearly every trial," the court explained, which "is precisely the reason why juries are empaneled to resolve factual inconsistencies." S-Suppl-App.1127. Diaz-Colon's "expansive interpretation" of misconduct would wrongly "impugn" the government in any case "involving more than one witness." S-Suppl-App.1127.

The court rejected Diaz-Colon's argument that the government committed misconduct in representing to counsel that the Musa recording was inaudible. The court found that the government's "email merely states that 'no enhancement [of this recording] was made,' confirming that Diaz received this audio file in a previous discovery package." S-Suppl-App.1127 (quoting D.E. 384, Ex. 1 at 181). The court concluded that Diaz-Colon's allegation was "frivolous." S-Suppl-App.1127-28.

The court also rejected Diaz-Colon's contention that the FBI engaged in "gross misconduct" in connection with its July 26, 2019 interview of him. S-Suppl-App.1128.

## B. Standards of Review

1. Where a defendant moved to dismiss the indictment based on false testimony presented to the grand jury, the Court reviews the denial of that motion for an abuse of discretion. *United States v. Brennick*, 405 F.3d 96, 99 (1st Cir. 2005). And where preserved, the Court "review[s] any challenges based on

prosecutorial misconduct before the grand jury under a harmless-error standard." *United States v. Reyes-Echevarría*, 345 F.3d 1, 4 (1st Cir. 2003). Unpreserved claims of false testimony presented to the grand jury are reviewed for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Muhammad*, 14 F.4th 352, 363 (5th Cir. 2021). "All but the most serious errors before the grand jury are rendered harmless by a conviction at trial." *Reyes-Echevarría*, 345 F.3d at 4.

2. Under *Napue v. Illinois*, 360 U.S. 264 (1959), a prosecutor "'may not knowingly use false evidence, including false testimony, to obtain a tainted conviction' regardless of whether the prosecution 'solicits false evidence' or … 'allows false evidence to go uncorrected when it appears.'" *United States v. Mangual-Garcia*, 505 F.3d 1, 10 (1st Cir. 2007) (brackets omitted) (quoting *Napue*, 360 U.S. at 269). "'A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury.'" *Id.* (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)). The Court reviews a preserved *Napue* claim "for manifest abuse of discretion." *United States v. Flores-Rivera*, 787 F.3d 1, 31 (1st Cir. 2015).

3. Under *Brady v. Maryland*, 373 U.S. 83 (1963), "the government is required to disclose to the defense evidence that is both favorable and material either to guilt or innocence, which includes evidence that is exculpatory and impeaching." *United States v. Orlandella*, 96 F.4th 71, 93 (1st Cir. 2024).

"Preserved *Brady* claims are reviewed for abuse of discretion, whereas unpreserved *Brady* claims are reviewed for plain error." *Id.* at 94 (citation omitted).

### C. The Government Did Not Present or Sponsor False Testimony in the Grand Jury.

Diaz-Colon contends that Agent Lopez, Maldonado-Nieves, and Lydmarie Torres (Collective Impact's general manager, *see* App.755-57) testified falsely before the grand jury. Br. 78-79 & n.8, 81. Such a claim requires Diaz-Colon to prove that the government knowingly sponsored false testimony and that the false testimony was material, *i.e.*, capable of influencing the grand jury's decision. *See Muhammad*, 14 F.4th at 363; *see also Reyes-Echevarría*, 345 F.3d at 4. The errors alleged here are mostly unpreserved, entirely meritless, and in all events rendered harmless by the guilty verdict.

### 1. Agent Lopez

According to Diaz-Colon, Agent Lopez falsely testified in the grand jury that, at Musa, Diaz-Colon asked Maceira for assistance with government contracts and said that Maldonado-Nieves was threatening to release damaging chat messages unless he received $300,000. Diaz-Colon contends that he never made those statements and that they do not appear in the transcript of the Musa recording appended to his new-trial motion. *See* Br. 78. This claim fails.

In the grand jury testimony cited by Diaz-Colon, Agent Lopez testified that the government's evidence supported the allegations in different paragraphs of the indictment. S-Suppl-App. 830-33. That testimony was correct and was borne out by the trial evidence. Diaz-Colon's allegation of false testimony thus boils down to a disagreement over what the government ultimately proved in its case. But as the district court found, such a disagreement does not mean that perjury or prosecutorial misconduct occurred. S-Suppl-App.1126; *see, e.g.*, *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (defining perjury under 18 U.S.C. § 1621).

Contrary to Diaz-Colon's assertion (Br. 78), the grand jury transcript pages he relies upon do not show Agent Lopez testifying that Diaz-Colon mentioned the $300,000 request at Musa. But if they did, they still would not establish that Agent Lopez committed perjury. Diaz-Colon errs in relying on the Musa recording transcript that he tendered with his new-trial motion as a complete statement of what was said during the Musa meeting. Even if authenticated, the transcript repeatedly lists portions of the Musa recording as "unintelligible" (S-Suppl-App. 730-90); notes a span of almost three minutes when "voices are inaudible" (S-Suppl-App. 783); and indicates that the recording terminated abruptly—before the meeting ended (S-Suppl-App. 788). *See also* S-Suppl-App.790 (court reporter's certificate: "Due to the noise at the

place the recording was made, the transcript will have unintelligible portions."). The transcript of the Musa recording does not establish that Agent Lopez testified falsely.

Finally, the petit jury's finding of guilt beyond a reasonable doubt on all counts rendered any inaccurate grand jury testimony by Agent Lopez harmless. *See Reyes-Echevarría*, 345 F.3d at 4.

### 2. Raul Maldonado-Nieves

According to Diaz-Colon (Br. 78-79), the government presented "misleading, perjured testimony" to the grand jury by allegedly allowing Maldonado-Nieves to testify that Diaz-Colon "made to him" an extortionate demand during the July 26, 2019 telephone call, without informing the grand jury that the call was made under the FBI's supervision. *See also* Br. 28-29 (alleging that the government "asked" Maldonado-Nieves in the grand jury "if he had ever received a $300,000.00 extortionate call from Sixto, to which Raulie answered once").

Diaz-Colon did not raise this claim below. Indeed, he does not cite the grand jury transcript in question; he notes that the district court required him to return grand jury materials to the government. *See* Br. 79 n.8. The absence of such a citation indicates that he never filed the transcript with the district court in connection with any claim below. Plain-error review applies.

Diaz-Colon cannot show error, let alone reversible plain error. At trial, Agent Lopez denied on cross-examination that, during the July 26 call with Maldonado-Nieves, the FBI wanted Diaz-Colon to make an extortionate offer concerning $300,000. Lopez testified, rather, that the FBI asked Diaz-Colon if Maldonado-Nieves would confirm Diaz-Colon's account about the $300,000 request put to Maceira; Diaz-Colon replied "Yes" and tossed his phone onto the table. App.921-23. Even if this Court accepts Diaz-Colon's characterization of Maldonado-Nieves's grand jury testimony, the fact that Maldonado-Nieves testified that Diaz-Colon mentioned a $300,000 extortionate payment during the July 26 phone call did not make his grand jury testimony knowingly false, let alone so clearly or obviously false that the government needed to clarify it.

Moreover, the indictment focused on Diaz-Colon's interactions with Maceira and alleged that the conduct underlying the extortion counts occurred between June 20 and July 19, 2019. *See* App.44-49. Because the alleged grand jury testimony by Maldonado-Nieves was immaterial to the extortion charges, it would not have clearly required clarification during the proceeding and would not have "substantially influenced the grand jury's decision to indict." *Reyes-Echevarría*, 345 F.3d at 4 (quotation marks omitted).

Finally, Maldonado-Nieves did not testify at trial. Because the petit jury did not hear Maldonado-Nieves's alleged characterization of Diaz-Colon's

statement during the July 26 call, its guilty verdict confirms the absence of prejudice. *See Reyes-Echevarría*, 345 F.3d at 4.

3.   Lydmarie Torres

According to Diaz-Colon (Br. 81), Lydmarie Torres admitted at trial that she "perjured herself before the grand jury on instructions of the case agents." Because he does not elaborate on this perfunctory claim, the Court should deem it waived. *See United States v. Vázquez-Rosario*, 45 F.4th 565, 571 n.7 (1st Cir. 2022); *United States v. Del Valle-Cruz*, 785 F.3d 48, 54 (1st Cir. 2015). At most, the claim is reviewable for plain error because Diaz-Colon asserted below that Torres testified falsely "at trial," not in the grand jury. S-Suppl-App.649.

Diaz-Colon cites the portion of Torres's cross-examination where the defense tried to establish an inconsistency between her trial testimony and grand jury testimony, specifically, that Torres contradicted her grand jury testimony by testifying that Diaz-Colon did not submit an invoice to Collective Impact for consulting services. App.802-08. After the defense attempted to refresh Torres's recollection of her grand jury testimony, Torres reaffirmed her trial testimony that Diaz-Colon never submitted an invoice: "I do not have an invoice from Sixto. If that means I committed a crime [in the grand jury], then I will be responsible for my acts, but I want it to be clear." App.805.

No error, let alone plain error, occurred. Torres's trial testimony indicates that she was simply mistaken to the extent she testified in the grand jury that Diaz-Colon had provided an invoice, not that she deliberately provided false testimony and that the government knowingly sponsored it. *Cf. United States v. Renzi*, 769 F.3d 731, 752 (9th Cir. 2014) ("Mere inconsistencies or honestly mistaken witness recollections generally do not satisfy the falsehood requirement [of *Napue*]."). Diaz-Colon's allegation that Torres committed perjury at the FBI's direction is frivolous.

Moreover, any error did not prejudice Diaz-Colon because the existence or non-existence of an invoice was immaterial to the extortion charges, and the jury convicted him notwithstanding the defense's attempt to impeach Torres with her grand jury testimony. *See Reyes-Echevarría*, 345 F.3d at 4.

### D. The Government Did Not Present or Sponsor False Trial Testimony by Maceira.

Renewing his *Napue* claim, Diaz-Colon contends (Br. 79-80) that Maceira falsely testified at trial that (a) at Musa, Diaz-Colon said multiple times (not just once) that the chat messages would destroy Maceira and said that Maldonado-Nieves wanted $300,000 in exchange for not releasing the messages; and (b) he informed Governor Rosselló about Diaz-Colon's threatening Telegram message and statements at Musa on June 20 and 21, 2019, respectively. Diaz-Colon is wrong.

To begin, Diaz-Colon's allegations of falsity concerning the first category of Maceira's testimony—what Diaz-Colon did and did not say at Musa—are based on the mistaken premise that the Musa recording captured his entire conversation with Maceira and, accordingly, that the transcript he tendered to the district court reflects everything that was said. *See* Br. 79-80 (repeatedly citing transcript). Again, the transcript repeatedly lists portions of the recording as unintelligible, notes a three-minute gap when voices on the recording are not audible, and shows that the recording terminated abruptly. S-Suppl-App.730-90. The tendered transcript does not establish that Maceira's testimony was false.

Nor has Diaz-Colon shown that Maceira testified falsely about telling Governor Rosselló about the extortion attempt. Diaz-Colon relies on Rosselló's statements during an FBI interview. Br. 79. But he does not explain why, or cite authority holding that, interview statements are entitled to greater weight than sworn trial testimony in order to establish falsity under *Napue*.

Regardless, Diaz-Colon cannot prevail even if his version of events is accepted. Mistaken witness recollections are insufficient to support a claim under *Napue*. *See Renzi*, 769 F.3d at 752. To the extent Maceira's testimony was inaccurate, Diaz-Colon "provided no evidence that [Maceira] knew his testimony was inaccurate at the time he presented it, rather than [his] recollection merely being mistaken, inaccurate or rebuttable." *Henry v. Ryan*, 720

F.3d 1073, 1084 (9th Cir. 2013) (emphasis omitted). As the district court explained, "[w]itness recollections vary, and conflicting evidence is offered at nearly every trial," but the existence of factual inaccuracies does not mean that a witness has committed perjury. S-Suppl-App.1127. And Diaz-Colon has not shown that Maceira's allegedly false testimony was "knowingly … false" to the prosecutors. *Flores-Rivera*, 787 F.3d at 32 (quotation marks omitted).

Finally, none of the allegedly false testimony "could in any reasonable likelihood have affected the judgment of the jury." *Mangual-Garcia*, 505 F.3d at 10 (quotation marks omitted). Whether Maceira informed the Governor of the extortion attempt, whether Diaz-Colon said once or more than once at Musa that the chat messages would destroy the Maceira, and whether Diaz-Colon mentioned $300,000 at Musa were not material to guilt or innocence in light of all the evidence of Diaz-Colon's attempt to extort Maceira. This includes, for example, Diaz-Colon's threatening Telegram message of June 20, which stated in part that Maldonado-Nieves was going to "destroy [them] all at other levels" Suppl-App.125 (capitalization removed), and his incriminating statements at Il Postino. Indeed, the jury heard Diaz-Colon repeatedly discuss or reference the demand for $300,000 on the Il Postino recording, Suppl-App.83-84, 96-97, 101-02, so even if Maceira was mistaken about Diaz-Colon mentioning $300,000 at Musa, it is not reasonably likely that this testimony affected the jury's guilty

verdict. The district court did not manifestly abuse its discretion in rejecting Diaz-Colon's *Napue* claim.

### E.    The Government Complied with its *Brady* Obligations.

Diaz-Colon contends (Br. 81-85) that the government violated *Brady* by not producing to the defense either an enhanced version of the Musa recording or a transcript and English translation of the recording. A claimed *Brady* violation "must satisfy three elements": (1) "'[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching'"; (2) "'that evidence must have been suppressed by the State, either willfully or inadvertently'"; and (3) "'prejudice must have ensued.'" *United States v. Morales-Rodríguez*, 467 F.3d 1, 14 (1st Cir. 2006) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Diaz-Colon has not satisfied any element.

First, the evidence was not exculpatory or impeaching. Diaz-Colon asserts that an English translation of the recording "could have been used … to challenge the government's narrative" that Diaz-Colon requested a $300,000 payment for Maldonado-Nieves at Musa. Br. 82. But again, Diaz-Colon incorrectly assumes that the transcript tendered in support of his new-trial motion reflects everything said during the Musa meeting, when in fact the transcript repeatedly notes that portions of the recording are unintelligible or inaudible and indicates that the recording ended abruptly.

Second, the government did not suppress evidence under *Brady*. It produced the recording of the Musa meeting in June 2021, more than 19 months before trial. *See* App.908-09, 911-12. As the government advised defense counsel, "no enhancement was made" of that recording. S-Suppl-App.834. Nor, given audibility problems, did the government have a transcript or translation of the recording prepared. S-Suppl-App.834; *see also* App.903 (Agent Lopez testifying that he was not aware of any transcript or translation).[10] Because the government produced a copy of the original Musa recording to the defense long before trial, it complied with its *Brady* obligations. *See United States v. Hall*, 434 F.3d 42, 55 (1st Cir. 2006) ("The government's obligations under *Brady* only extend to information in its possession, custody, or control."); *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002) ("*Brady* applies to material that was known to the prosecution but unknown to the defense.").

Diaz-Colon errs in contending (Br. 82-84) that an enhanced recording, or a transcript and translation of the recording, must exist because, contrary to the government's reference to the recording's "inaudibility" in an email (S-Suppl-App.836), Agent Lopez testified that the Musa recording was audible (App.903). The government's email responded to a specific inquiry by defense counsel

---

[10] The government did not introduce any portion of the Musa recording into evidence at trial.

about the availability of a transcript and referenced audibility problems with the recording in explaining why no transcript existed. Diaz-Colon's own transcript of a purportedly enhanced version of the Musa recording shows that portions of the recording were not intelligible or audible. S-Suppl-App. 730-90; *see also* App.538-42 (Maceira testimony that portions of recording were inaudible to him). That Agent Lopez characterized the recording as audible when he later testified at trial does not prove that the government possessed an enhanced Musa recording. Nor did Hinton's inability to recall specifically whether he had enhanced a recording other than the Il Postino recording. *See* Br. 84. The government did not possess an enhanced version of the Musa recording. Diaz-Colon's attempt to establish a *Brady* violation based on speculative assertions concerning non-existent material should be rejected.

Diaz-Colon's contentions (Br. 76, 83-84) that the government misled him about the audibility of the recording and that he relied on the government's representation are baseless. When the defense inquired on the eve of trial about the availability of a transcript and enhanced recording (S-Suppl-App.834-37), it had been in possession of the Musa recording for more than 19 months. The defense could have made, and likely did make, its own assessment of the recording's audibility during this period.

Nor was the government required to obtain an enhancement, transcript, or translation of the Musa recording. *See* Br. 82-83. As the district court found, the recording itself was the evidence, and the defense had a copy of it well before trial. App.912-13. Language posed no barrier to the defense using it in whichever way the defense saw fit—the recording was of Diaz-Colon's own Spanish-language conversation. The government did not suppress evidence by not obtaining and producing an enhanced recording, transcript, or translation. *See Paonessa v. Hall*, 241 F. App'x 391, 393 (9th Cir. 2007) (unpublished) (government failure to transcribe an interview "was not a *Brady* violation as a cassette tape containing the interview was made available to defense counsel"); *United States v. Parks*, 100 F.3d 1300, 1302-03, 1305-08 (7th Cir. 1996) (government did not suppress evidence where it produced, 13 months before trial, 65 hours of taped communications and a transcript of the four hours it intended to use at trial; government was not obligated under *Brady* to transcribe the remaining 61 hours because "both sides ha[d] an equal opportunity to make use of the tapes, which includes making transcripts").

Third, Diaz-Colon cannot establish prejudice because the recording was not material for *Brady* purposes—no "reasonable probability" exists that, had an enhanced recording, transcript, or translation "been disclosed to the defense, the result of the proceeding would have been different." *United States v. Celestin*, 612

F.3d 14, 23 (1st Cir. 2010) (quotation marks omitted). The government's production of the original recording in 2021 gave the defense ample opportunity to obtain its own enhancement, transcript, or translation. *Cf. United States v. Peters*, 732 F.2d 1004, 1009 (1st Cir. 1984) (production of *Brady* material during trial did not prejudice defendants because they had two full days to use it in preparing cross-examination of witness and nine days between production and end of trial); *United States v. Gee*, 695 F.2d 1165, 1166-68 & n.1 (9th Cir. 1983) (holding that defendant was not prejudiced by delayed production of recording transcript because he had his own copy of tape recording). Diaz-Colon does not explain why he was prevented from taking such measures during the 19-month period before trial when the defense possessed a copy of the Musa recording.

In any event, because the recording did not capture the entire Musa meeting, a fully enhanced recording (or the availability of a transcript and translation) at trial would not have established that Diaz-Colon did not request $300,000 at Musa. Even if it did, there is no reasonable probability of a different outcome in light of all the evidence of Diaz-Colon's guilt, including his recorded statements about the $300,000 extortionate demand at Il Postino. Diaz-Colon has not shown that the non-existent material he sought from the government "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

## IV. THE DISTRICT COURT REASONABLY LIMITED THE DEFENSE'S CROSS-EXAMINATION OF TWO WITNESSES.

Diaz-Colon contends (Br. 91-103) that the district court violated his Sixth Amendment confrontation right by precluding him from cross-examining Agent Lopez and Maceira on certain matters. This claim lacks merit.

### A. Background

#### 1. Agent Lopez

On direct examination, Agent Lopez testified that Diaz-Colon did a "recording" with Maldonado-Nieves while they were interviewing Diaz-Colon at his home on July 26, 2019. App.850. But Agent Lopez did not testify about the substance of Diaz-Colon's conversations with Maldonado-Nieves or the contents of that recording. App.850.

On cross-examination, Agent Lopez identified the call that Diaz-Colon made to Maldonado-Nieves on July 26 in Maldonado-Nieves's cell phone records, which Diaz-Colon introduced into evidence. App.886-87, 891-92. After getting Agent Lopez to confirm that the FBI had recorded the call, defense counsel stated, "Your Honor, we request the official call so he can authenticate it," whereupon the government objected. App.892. At sidebar, the government maintained that the defense should be precluded from "making representations in front of the jury" suggesting that the government had not provided the defense discovery materials, such as the July 26 recording, which in fact the government

turned over in February 2021 (almost two years before trial). App.893-94. The government also objected on hearsay grounds to admitting the contents of the recorded call through Agent Lopez. App.894. Defense counsel maintained that Agent Lopez was present for and heard the conversation between Diaz-Colon and Maldonado-Nieves. App.894-95. The district court sustained the government's hearsay objection to admitting the recording. App.895.

Despite this ruling, Diaz-Colon tried to elicit from Agent Lopez what Diaz-Colon and Maldonado-Nieves said during the July 26 call; the government objected again, and the district court sustained the objection. App.896-97. At sidebar, the court told counsel that the defense needed to call one of the conversation's participants (Maldonado-Nieves or Diaz-Colon) as a witness to introduce the contents of their conversation and rejected counsel's argument that he was only trying to elicit "impeachment evidence." App.897-99; *see* App.898 ("It's still hearsay. You have to ask one of the participants. You ask Raulie if he requested $300,000, or you ask your client if he requested $300,000.").

The defense had Agent Lopez confirm again that the July 26 call was recorded. App.899. Counsel then asked: "And you know, you know that the recording is available and the transcript?" App.900. The court admonished counsel not to "ever do that again" and directed counsel to move on. App.900.

2.   <u>Maceira</u>

Relevant to Diaz-Colon's claim, the defense asked Maceira on cross-examination whether, after the Telegram chat messages "started coming out" in early July 2019, he had denied to the press being a part of the chats; Maceira testified that he did. App.551. The government objected when counsel then asked, "in fact, the next day, several newspapers and people that were interviewed came out with information that you had lied to the press?" App.551. The district court sustained the objection because Maceira had admitted denying that he was in the chats and "[w]hether or not it was in the newspaper … doesn't really matter." App.551-52.

The defense elicited from Maceira that he resigned as Public Affairs Secretary on July 28, 2019, and that he published his letter of resignation. App.553. The government objected when counsel then asked, "Isn't it a fact that … the governor, Wanda Vazquez, came to the press and said that she had fired you; that you had not resigned? Isn't that so?" App.553. Defense counsel replied that his question was valid because, according to a newspaper article, "the governor said he was lying." App.553. The court sustained the objection. App.553.

The defense elicited from Maceira that "part of the chaos" that occurred after the Telegram chat messages were leaked was that certain administration

officials were being criminally charged at this time. App.554-55. The government objected when counsel then asked whether, upon seeing that two officials had been arrested, Maceira was "worried that [he] might be the next one"; the court sustained the objection. App.555.

Finally, after establishing that Maceira had been a lawyer since 2017 and that he personally decided to record his meeting at Musa with Diaz-Colon, the defense asked Maceira whether he knew that it was a crime in Puerto Rico to record a person without the person's knowledge and consent. App.534. Maceira testified that there were exceptions under the law that allowed non-consensual recording, "including if the person has been the victim of a threat or harassment and expects that the communication will be a continuance of that." App.534. When counsel then asked Maceira about a specific law that purportedly governed the recording, the government objected. App.535. The court sustained the objection, noting that Maceira had "already answered the question," and denied Diaz-Colon's request to admit into evidence, or for the court to take judicial notice of, the law in question. App.535-36. The court also sustained an objection to asking Maceira whether he was "aware" that he was "committing a crime" when he recorded Diaz-Colon's statements at Musa. App.536.

## B. Standard of Review

Limitations on cross-examination "can be overturned on appeal only if the reviewing court finds them to be both unreasonable and prejudicial." *United States v. Raymond*, 697 F.3d 32, 40 (1st Cir. 2012); *see United States v. Van Anh*, 523 F.3d 43, 52-54 (1st Cir. 2008) (upholding exclusion of inadmissible evidence defendant sought to introduce on cross-examination). The Court "review[s] de novo whether a defendant was afforded a reasonable opportunity to impeach a witness, and for abuse of discretion limitations the trial court imposed on that opportunity." *United States v. Casey*, 825 F.3d 1, 24 (1st Cir. 2016).

The Court reviews a district court's exclusion of hearsay evidence for abuse of discretion. *See United States v. Guzman*, 603 F.3d 99, 107 (1st Cir. 2010); *United States v. Millan*, 230 F.3d 431, 436 (1st Cir. 2000). Arguments supporting admissibility raised for the first time on appeal are reviewed for plain error. *See United States v. DeSimone*, 488 F.3d 561, 570 (1st Cir. 2007).

## C. No Confrontation Clause Violation Occurred.

"The Confrontation Clause of the Sixth Amendment secures a right to cross-examination in order to test the believability of a witness and the truth of his testimony." *United States v. Rivera-Donate*, 682 F.3d 120, 126 (1st Cir. 2012) (quotation marks omitted). "This right is not without limits, however; the district court wields considerable discretion to impose 'reasonable limits' on cross-

examination." *Casey*, 825 F.3d at 24 (quoting *Raymond*, 697 F.3d at 39-40); *see Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Such "reasonable limits" may be "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679. The limitations imposed by the district court here were reasonable and well within the bounds of its discretion.

### 1. Agent Lopez

Diaz-Colon contends that the district court violated his confrontation right by not allowing him to cross-examine Agent Lopez about the contents of the recorded call between Diaz-Colon and Maldonado-Nieves on July 26. To the contrary, the restriction was proper because the recorded call was inadmissible hearsay.

a. The defense's objective in cross-examining Agent Lopez about the July 26 call was to show that Maldonado-Nieves denied ever wanting to take money from Maceira and told Diaz-Colon that his only goal was to stop the administration from attacking his father. *See* S-Suppl-App.70-71 (recording transcript). Diaz-Colon offered Maldonado-Nieves's out-of-court statements for the truth of the matter asserted—to prove that Maldonado-Nieves had not been trying to extort Maceira. As the district court found, Maldonado-Nieves's

statements did not impeach any testimony that Agent Lopez provided on direct examination. App.897-99. Because the out-of-court statements were offered for their truth, they were inadmissible, and the court properly excluded them. Fed. R. Evid. 801(c), 802; *see, e.g.*, *United States v. DeCologero*, 530 F.3d 36, 58-59 (1st Cir. 2008).

b. Diaz-Colon asserts various grounds for admitting Maldonado-Nieves's statements, Br. 97-101, which are mostly subject to plain-error review because he did not raise them below. His arguments fail under any standard.

First, that Agent Lopez "heard the conversation when it was made" did not convert Maldonado-Nieves's out-of-court statements into present sense impressions under Rule 803(1). Br. 97. This hearsay exception applies to "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). Maldonado-Nieves was the declarant here, not Agent Lopez, and he was not describing or explaining a substantially contemporaneous "event or condition" when he made the statements in question. *See United States v. Boyce*, 742 F.3d 792, 796 (7th Cir. 2014) ("The theory underlying the present sense impression exception 'is that substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation.'") (quoting Fed. R. Evid. 803 advisory committee's note).

Second, the rule of completeness did not authorize admitting Maldonado-Nieves's statements on the theory that the government "opened the door" to the evidence during direct examination of Agent Lopez. Br. 98-99. The rule of completeness is codified in Rule 106, *see United States v. Bucci*, 525 F.3d 116, 133 (1st Cir. 2008), which, at the time of trial, provided that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time," Fed. R. Evid. 106 (2011). Here, the government did not introduce any part of Maldonado-Nieves's conversation with Diaz-Colon; it simply asked Agent Lopez whether a recorded conversation occurred. App.850. The "lack of any predicate statements" rendered the rule of completeness inapplicable. *United States v. Brown*, 669 F.3d 10, 20 n.17 (1st Cir. 2012).

Third, Diaz-Colon errs in relying on cases involving conversations between defendants and informants or cooperating co-defendants. *See* Br. 99-100. In those cases, the defendant's statements were properly introduced against him under the hearsay exemption for party admissions, Fed. R. Evid. 801(d)(2)(A), and any statement by a conversation participant was admitted to provide context to the defendant's properly admitted statements. *See United States v. McDowell*, 918 F.2d 1004, 1007 (1st Cir. 1990); *United States v. Jordan*,

810 F.2d 262, 264 (D.C. Cir. 1987); *United States v. Kenny*, 645 F.2d 1323, 1339-40 (9th Cir. 1981); *see also United States v. White*, 868 F.2d 305, 306 (8th Cir. 1989) (defendant's statements admitted as party-opponent admissions under Rule 801(d)(2)(A)); *United States v. Whitman*, 771 F.2d 1348, 1352 (9th Cir. 1985) (informant's statements admitted to provide context to co-conspirator statements admitted under Rule 801(d)(2)(E)). Here, Maldonado-Nieves's out-of-court statements were not admissible; that Diaz-Colon's statements on the July 26 call provided context to what Maldonado-Nieves said is of no consequence.

Fourth, the evidence was not admissible as an opposing-party admission under Rule 801(d)(2)(C). Diaz-Colon's theory here appears to be that he had been acting as Agent Lopez's agent when calling Maldonado-Nieves and that, at trial, Maldonado-Nieves's statements were offered against the government because Maldonado-Nieves did not incriminate himself on the recording. *See* Br. 99-101. Again, Maldonado-Nieves is the declarant; the statements of Maldonado-Nieves were the ones Diaz-Colon ultimately sought to introduce because his own statements on the recording have no independent relevance. But Maldonado-Nieves was not an agent of the government, even assuming arguendo that Diaz-Colon was. Rule 801(d)(2)(C) is inapplicable. And even if

Diaz-Colon's newly raised argument were viable, he has not shown that any error satisfied the plain-error standard.

Finally, Maldonado-Nieves's out-of-court statements were not admissible to show the "effect" on Agent Lopez as the "hearer" or "listener." Br. 99 (citing *United States v. Williams*, 952 F.2d 1504, 1517-18 (6th Cir. 1991)). Agent Lopez's state of mind was not relevant to the elements of the charged offenses or any defenses Diaz-Colon could assert.

c. Even if the Court were to conclude that Diaz-Colon should have been allowed to elicit the substance of his recorded conversation with Maldonado-Nieves when cross-examining Agent Lopez, Diaz-Colon suffered no prejudice. *Raymond*, 697 F.3d at 40. The district court told the defense that it could introduce the July 26 call evidence through Maldonado-Nieves (or Diaz-Colon, if he testified). App.897-99. Although the government ultimately did not call Maldonado-Nieves as a witness, Diaz-Colon cites nothing in the record indicating that he tried, but was unable, to secure Maldonado-Nieves's trial testimony. *See* App.996-97 (defense declines to present case).

Moreover, Maldonado-Nieves's July 26 statements denying that he sought to obtain money from Maceira, if admitted, would not have helped Diaz-Colon's defense to the charges. Given the recording of Diaz-Colon making demands at Il Postino for $300,000 (among other things), Maldonado-Nieves's

July 26 statements would have suggested that, at least by this point, Diaz-Colon was attempting to extort Maceira on his own.

    2.    <u>Maceira</u>

Diaz-Colon challenges (Br. 102) four limitations imposed on his cross-examination of Maceira. These challenges are waived and meritless.

a. The challenges are waived because Diaz-Colon makes only a perfunctory, one-sentence argument in his brief to support his claim that the district court abused its discretion, asserting that the evidence "was permissible cross examination since it went to [Maceira's] credibility." Br. 102. Because Diaz-Colon has made only a passing claim, unsupported by any attempt at developed argumentation, the Court should not consider it. *See Del Valle-Cruz*, 785 F.3d at 54.

b. In all events, his claim is meritless. First, the district court properly precluded the defense from asking Maceira whether newspapers had released information contradicting his public denial of involvement in the leaked chat messages. Maceira admitted on cross-examination that he had publicly denied involvement in the chat messages when they were released, App.551, even though, as he testified on direct, he had in fact been involved in the final portion of them, App.342-43. It was therefore irrelevant whether a newspaper separately reported that, contrary to Maceira's public denial, he was involved in the chat

messaging. The district court did not abuse its "broad discretion" over the scope of witness impeachment by limiting cross-examination on this point. *United States v. Rodriguez*, 63 F.3d 1159, 1168 (1st Cir. 1995).

Similarly, the court properly prevented cross-examination on what then-Governor Vazquez told the press about Maceira's departure from the administration in late July 2019, *i.e.*, whether he resigned or was fired. Maceira was the victim of attempted extortion; the circumstances of his departure from government were not relevant to issues in the case. *See United States v. Beauchamp*, 986 F.2d 1, 4 (1st Cir. 1993) (a matter is collateral for impeachment purposes if "the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness") (quotation marks omitted). Maceira's testimony indicated that he submitted a resignation letter. App.553. Even as to this collateral matter, establishing what the Governor told the press about Maceira's departure would not necessarily have established a contradiction in Maceira's testimony. And Diaz-Colon was not entitled to introduce extrinsic evidence of the Governor's statements. *See United States v. Cruz-Rodríguez*, 541 F.3d 19, 30 (1st Cir. 2008) ("It is well established that a party may not present extrinsic evidence to impeach a witness by contradiction on a collateral matter.") (quotation marks omitted).

Asking Maceira whether, after the chats were publicly released, he was "worried" that he might be arrested was likewise outside the scope of proper impeachment. App.555. Again, the point was irrelevant to the issues in the case. And the question lacked foundation—there was no evidence that Maceira had engaged in criminal conduct while working in the administration. In any event, the court later permitted the defense to ask Maceira, over the government's objection, whether he had concerns that Diaz-Colon might expose Maceira's own alleged "corruption"; Maceira replied that he had no concerns about his own conduct and, for this reason, "was able to go voluntarily to the FBI" and report Diaz-Colon's conduct. App.611.

Finally, the district court properly limited cross-examination about the legality of the Musa recording. The defense elicited from Maceira his understanding of whether it was lawful to make the recording; Maceira testified that he believed that a "victim of a threat or harassment" may record a communication that the victim "expects" to be a "continuance of that" threat or harassment. App.534. But attempting to establish that Maceira's legal understanding was wrong—as the defense sought to do—had limited, if any, impeachment value and risked confusing the jury. *See Van Arsdall*, 475 U.S. at 679. Whether the recording was permissible as a matter of Puerto Rico law, *see* App.535, did not affect any issues in the case. The district court did not abuse

its broad discretion by limiting impeachment on this collateral matter. *See Rodriguez*, 63 F.3d at 1168.

c. Even if a limitation imposed on Maceira's cross-examination was unreasonable, it did not prejudice Diaz-Colon. *See Raymond*, 697 F.3d at 40. The limitations concerned collateral matters, and Diaz-Colon was permitted to elicit some testimony in these areas. The defense conducted a lengthy cross-examination of Maceira. App.524-616. Through questioning, the defense emphasized, among other things, that Diaz-Colon repeatedly stated at Il Postino that he would not engage in extortion, App.587; that Maceira had no power to authorize the renewal of the Collective Impact and Social Consulting contracts, App.605; and that, on or around July 13, 2019, then-Governor Rosselló and his wife asked Maceira to meet with Diaz-Colon in case Diaz-Colon had a way to help with the crisis spawned by the chat messages, App.595-97. In short, the district court granted the defense "sufficient leeway" to thoroughly challenge Maceira's veracity, motivation, and any purported bias. *United States v. Laboy-Delgado*, 84 F.3d 22, 28 (1st Cir. 1996). The jury simply believed Maceira. Reversal is not warranted.

## V.   THE DISTRICT COURT DID NOT REVERSIBLY ERR IN INSTRUCTING THE JURY ON THE CHARGED OFFENSES.

Diaz-Colon (Br. 114-30) challenges the jury instructions on various grounds. Each challenge fails.

## A.    Background

1. In connection with Count One, the district court instructed the jury that, in order to find that Diaz-Colon attempted to commit extortion, it had to find, *inter alia*, that he "engaged in a purposeful act that, under the circumstances as he believed them to be, amounted to a substantial step toward the commission of th[e] crime [of extortion] and strongly corroborated his criminal intent." App.1016. It then explained that a "'substantial step' is an act in furtherance of the criminal scheme" and "must be something more than mere preparation, but less than the last act necessary before the substantive crime is completed." App.1016. The court defined extortion as "obtaining property from another person with his or her consent, but where that consent is obtained by wrongful use of actual or threatened fear," adding: "Defendant must know that he was not legally entitled to the property." App.1015.

As to Count Two, the district court defined "true threat" and "intent to extort" after instructing the jury on the elements of an offense under 18 U.S.C. § 875(d). App.1017-18. A "true threat," the court explained, "is a serious threat, not idle talk, a careless remark, or something said jokingly, that is made under circumstances that would place a reasonable person in fear of damage to his or her reputation, or damage to another person's reputation." App.1017. And acting with the "intent to extort," the court explained, "means to act with the

purpose of obtaining money or something of value from someone who consents because of the true threat." App.1018.

The court instructed the jury that it could find Diaz-Colon guilty on Counts One or Two on the alternative ground that he aided and abetted someone else's commission of the charged offense, and then defined the elements of aiding and abetting liability. App.1019-21.

2. Diaz-Colon made various objections to the instructions. As relevant here, Diaz-Colon objected to the court's denial of his request to instruct the jury that "[m]ere conversations, preparation or contemplation to commit the offense, without more, cannot form the basis for a conviction for attempt." App.1041-43. He recognized, however, that the court had added language concerning the inadequacy of mere "preparation" to its instructions. App.1042. The court overruled this objection. App.1043.

Diaz-Colon further objected that the Count One instructions impermissibly allowed the jury to consider the Social Consulting and Collective Impact government contracts as part of the extortionate scheme, reiterating his argument under *Sekhar* that that the contracts were not transferable and therefore did not qualify as obtainable property under the Hobbs Act. App.1058. The court noted that it did not "know how the Government [would] treat these contracts in their closings," and instructed Diaz-Colon to object during closing

if he believed that the government used them improperly. App.1058. The government addressed the contracts during its rebuttal, arguing that Diaz-Colon's extortionist demands included the renewal of the government contracts and that he "was going to profit from these contracts." App.1152-54, 1159. Diaz-Colon, however, did not object to this argument, or renew his request for an instruction before the jury began deliberating. *See* App.1161.

Diaz-Colon objected to the aiding-and-abetting instruction as to Count One on the ground that accomplice liability requires the commission of the offense by another and that, here, the "attempted" commission of extortion does not satisfy this requirement; he maintained that only a completed extortion crime can be the subject of aiding-and-abetting liability. App.1033-34. Diaz-Colon requested that the jury also be instructed on the elements of a completed extortion offense, and that the verdict form set forth separate entries for "attempted extortion" and "aiding and abetting." App.1034, 1045-46. The court overruled this objection. App.1034, 1036.

As to Counts One and Two, Diaz-Colon objected that the instructions failed to inform the jury that it needed to find that the "threat" communicated by Diaz-Colon was "wrongful." App.1034-35, 1058-60. The court overruled this objection. App.1034, 1061.

Finally, Diaz-Colon maintained that, by incorporating into Counts Two and Three language in Count One alleging that he attempted to extort additional money from Maceira to prevent the release of additional Telegram messages, the indictment impermissibly injected an attempt theory into Counts Two and Three, which charged only completed crimes. Diaz-Colon objected to allowing the jury to consider the purportedly "misleading" language about attempt. App.1035-36. The court overruled this objection. App.1036, 1045.

### B. Standard of Review

This Court reviews preserved challenges to the substance of jury instructions de novo and preserved challenges to the wording and form of instructions for an abuse of discretion. *See, e.g.*, *United States v. Correia*, 55 F.4th 12, 41 (1st Cir. 2022); *United States v. Vega-Martínez*, 949 F.3d 43, 50 (1st Cir. 2020). The Court reviews all forfeited challenges to jury instructions under the plain-error standard. *Correia*, 55 F.4th at 41.

### C. No Reversible Error Occurred.

Diaz-Colon appears to make five claims of instructional error. As to Count One, he challenges: (1) the instruction defining a substantial step, Br. 124; (2) the denial of an instruction requiring the jury find that the Social Consulting and Collective Impact contracts were "transferable" before they could be considered property under the Hobbs Act, Br. 124-25; and (3) the giving of an

aiding-and-abetting instruction, Br. 125-26. As to Count Two, he challenges (4) the denial of an instruction requiring the jury to find that his threat was "wrongful." Br. 35. As to Counts Two and Three, he challenges (5) the denial of a "curative instruction" precluding the jury from considering an attempt theory. Br. 127-30. Each challenge fails.

1. <u>The district court correctly instructed the jury on the meaning of a substantial step.</u>

The district court correctly instructed the jury that a "'substantial step' is an act in furtherance of the criminal scheme" and that it "must be something more than mere preparation, but less than the last act necessary before the substantive crime is completed." App.1016. Those instructions "conveyed the essence of the applicable law," *Correia*, 55 F.4th at 41, as this Court has defined it. *See Pérez-Rodríguez*, 13 F.4th at 13 (explaining that a "substantial step toward commission of an offense is less than what is necessary to complete the substantive crime, but more than mere preparation") (quotation marks omitted); *Turner*, 501 F.3d at 68 (explaining that a substantial step is more than "mere preparation" but does not require that the defendant "get very far along the line toward ultimate commission of the object crime") (quotation marks omitted).

Diaz-Colon's claim is that the district court should have instructed the jury that "mere conversations, preparation, or contemplation to commit the offense, without more, cannot form the basis for a conviction for attempt." Br. 124. But

again, the court instructed the jury that mere preparation is not a substantial step. App.1016. The court did not need to add that mere contemplation of an offense is insufficient because the existing instructions precluded conviction on that ground. Merely thinking about committing the offense is not "an act in furtherance of the criminal scheme" that "strongly corroborate[s]" the defendant's "criminal intent." App.1016. And the jury knew that contemplation is insufficient from the instruction that a substantial step requires more than preparation; one who prepares to commit an offense necessarily contemplates committing it. *See United States v. Law*, 528 F.3d 888, 902 (D.C. Cir. 2008) (per curiam) (district courts need not "presume the jury lacks common sense" when applying instructions).

Nor did the court err in refusing to instruct that "mere conversations" cannot be a substantial step toward commission of the offense. Diaz-Colon's requested instruction was legally incorrect. An extortionist's communication to the victim of his demand for things of value, as well as the consequences of not complying, is the crux of an extortion crime; a conversation effecting that communication is a substantial step toward committing it. *See Marsh*, 26 F.3d at 1500-02; *see also Pérez-Rodríguez*, 13 F.4th at 15 (child-enticement case). That is what Diaz-Colon did here: during in-person conversations at both Musa and Il Postino, Diaz-Colon told Maceira that damaging information about the

104

administration would be released unless Maceira paid $300,000 and provided other benefits. The jury could readily find that each conversation, or the two in combination, amounted to a substantial step. Because it would have been incorrect to instruct the jury that a conversation alone can never amount to a substantial step, the district court correctly denied Diaz-Colon's request. *See United States v. DeStefano*, 59 F.3d 1, 4 (1st Cir. 1995).

2. <u>The district court did not plainly err in allowing the jury to consider government contracts as property.</u>

There is likewise no merit to Diaz-Colon's contention that the court erred by not instructing the jury on Count One that it had to find that the government contracts held by Social Consulting and Collective Impact were "transferable," before it could treat them as property to be obtained under the extortion scheme.

To begin, Diaz-Colon forfeited his instructional challenge because he did not renew his objection, either when the government addressed the contracts during its rebuttal argument, App.1152-54, 1159, or before the jury retired to deliberate, App.1161. When it deferred ruling on Diaz-Colon's objection, the court stated that it needed to hear how the government treated the contracts during closing arguments. App.1058. Because Diaz-Colon did not renew his objection to the transferability of the contracts after jury arguments, the court had reason to believe that he was no longer requesting an instruction on it. Plain-error review applies. *See* Fed. R. Crim. P. 30(d); *Correia*, 55 F.4th at 41.

In any event, the court committed no error. Again, Diaz-Colon mistakenly focuses on whether the government contracts were transferable to other companies, as opposed to whether the contracts could be re-awarded to Collective Impact and Social Consulting and whether monies paid under those renewed contracts were transferable property. *See* pp. 39-42, *supra*. Contract payments are what Diaz-Colon was trying to "obtain[]" for the companies and himself through the wrongful use of fear. 18 U.S.C. § 1951(b)(2). Diaz-Colon does not dispute that monetary payments are obtainable property under the Hobbs Act, or that the district court defined extortion for the jury in accordance with the statutory definition. *See* App.1015. That instruction was correct and legally sufficient.

Nor was any error plain, *i.e.*, clear or obvious. Diaz-Colon cites no case requiring a court to instruct the jury on whether property is "transferable" under the Hobbs Act, let alone on facts comparable to those here, or otherwise show that the asserted error is not "open to doubt or question." *United States v. Morales*, 801 F.3d 1, 10 (1st Cir. 2015). Diaz-Colon also cannot show that any plain error affected his substantial rights, given the overwhelming evidence that he attempted to obtain other transferable property—$300,000, payments to media influencers, and government advertising dollars to fund a public relations campaign—pursuant to the scheme. *See United States v. Latorre-Cacho*, 874 F.3d

299, 311 (1st Cir. 2017) (recognizing that an instructional error "may not affect the defendant's substantial rights if there is overwhelming evidence that the jury still would have convicted absent the error") (quotation marks omitted).

> 3. The district court properly gave an aiding-and-abetting instruction on Count One.

Diaz-Colon appears to contend that instructing the jury on theories of principal and accomplice liability rendered Count One duplicitous, at least absent an instruction "requiring unanimous agreement on the underlying offense(s)." Br. 126; *see generally United States v. Prieto*, 812 F.3d 6, 11 (1st Cir. 2016) ("An indictment is improper if it joins, in a single count, two or more distinct offenses."). This argument is meritless.

The district court correctly instructed the jury that it could find Diaz-Colon guilty if he either attempted to commit extortion or aided-and-abetted that offense. App.1015-16, 1019-21. Count One charged, and the evidence proved, both theories of liability. App.48. This Court has held that "aiding and abetting is an alternative charge in every count, whether explicit or implicit." *United States v. Díaz-Rodríguez*, 853 F.3d 540, 546-47 (1st Cir. 2017) (ellipsis and quotation marks omitted); *accord United States v. Marino*, 277 F.3d 11, 29 (1st Cir. 2002). To the extent Diaz-Colon reprises his argument (App.1033-34) that only a completed crime, not an attempt, can be aided-and-abetted, *see* Br. 126, he is mistaken. *See, e.g.*, *United States v. Rodríguez*, 215 F.3d 110, 116 (1st Cir. 2000)

(explaining requirements for proving aiding-and-abetting attempt to import marijuana); *United States v. George*, 658 F.3d 706, 708 n.4 (7th Cir. 2011) ("[W]e note that it is possible to aid and abet a principal's attempt crime[.]"); *see generally* 18 U.S.C. § 2. No error occurred.

Nor did the district court err by not giving a specific unanimity instruction. Diaz-Colon cites no case requiring one where the jury is instructed on alternative theories of principal and aiding-and-abetting liability, and courts have held that a specific unanimity instruction generally is not required in this context. *See, e.g., United States v. Ferguson*, 676 F.3d 260, 279-80 (2d Cir. 2011); *United States v. Horton*, 921 F.2d 540, 545-46 (4th Cir. 1990); *United States v. Hankton*, 51 F.4th 578, 611-12 (5th Cir. 2022); *United States v. VanderZwaag*, 467 F. App'x 402, 408 (6th Cir. 2012) (unpublished); *United States v. Eagle Elk*, 820 F.2d 959, 961 (8th Cir. 1987); *United States v. Garcia*, 400 F.3d 816, 820 (9th Cir. 2005). Here, the general unanimity instruction, reinforced by the language in the verdict form stating that the jury is unanimous on each count, *see* App.1025, 1028, was sufficient. *Cf. United States v. Pena*, 910 F.3d 591, 601-03 (1st Cir. 2018) (rejecting claim that district court erred in not giving "particular" instruction on unanimity, where jury instructed on elements of wire fraud and aiding and abetting).

4. <u>The omission of wrongfulness language in the Count Two instructions does not warrant reversal.</u>

Diaz-Colon contends (Br. 35) that the district court erred by not "includ[ing] the word 'wrongful' as part of the definition of threat" in its jury instructions and that this omission allowed the jury to convict him for engaging in speech protected by the First Amendment. Diaz-Colon's short argument appears only in the Summary of Argument section of his brief, not in the Argument section corresponding to his jury instruction challenges. *See* Br. 114-30. And it is unclear whether Diaz-Colon raises the challenge as to Counts One and Two or only Count Two. This underdeveloped instructional claim is waived. *See United States v. Galíndez*, 999 F.3d 60, 72 (1st Cir. 2021); *United States v. Martí-Lón*, 524 F.3d 295, 299 n.2 (1st Cir. 2008). To the extent the Court considers it, reversal is not warranted.

a. No error occurred on Count One because the court correctly instructed the jury on wrongfulness. The court explained that "'[e]xtortion' means obtaining property from another person with his or her consent, but where that consent is obtained by wrongful use of actual or threatened fear." App.1015. That language tracked the Hobbs Act. 18 U.S.C. § 1951(b)(2). Consistent with precedent, the court further instructed the jury that the "[d]efendant must know that he was not legally entitled to the property." App.1015; *see, e.g.*, *Enmons*, 410 U.S. at 399-400; *Sturm*, 870 F.2d at 773. These instructions were correct. And

by requiring a finding that Diaz-Colon wrongfully used actual or threatened fear to attempt to obtain property to which he knowingly was not entitled, they prevented the jury from predicating guilt on speech protected by the First Amendment. *See* pp. 46-48, *supra*.

b. On Count Two, the district court did not instruct the jury on wrongfulness when explaining the meaning of "intent to extort." App.1017-18. As discussed (pp. 43-44, *supra*), the Second and Sixth Circuit have held that 18 U.S.C. § 875(d) incorporates the basic concept of extortion, which includes an element of wrongfulness, and that the interstate communication of a threat to reputational harm is "wrongful" where the threatener seeks money or property to which he "does not have, and cannot reasonably believe [he] has, a claim of right, or where the threat has no nexus to a plausible claim of right." *Jackson*, 180 F.3d at 71; *accord Coss*, 677 F.3d at 286-88. Again, for purposes of this appeal, the government assumes that this more narrow reading of the statute is correct. But the alleged error in not instructing the jury on a wrongfulness requirement as to Count Two was harmless, because it is clear "beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." *Neder v. United States*, 527 U.S. 1, 17 (1999); *see, e.g.*, *United States v. Pizarro*, 772 F.3d 284, 298-99 (1st Cir. 2014).

First, Diaz-Colon did not contend at trial that he had, or reasonably believed to have, a claim of right to the property he demanded from Maceira, or that the threatened release of messages had a plausible connection to such a claim. *See Jackson*, 180 F.3d at 71; *Coss*, 677 F.3d at 286-88. His defenses were that he was passing along a message from Maldonado-Nieves and warning his friend (Maceira) about the potential release of damaging information, App.1092-94, 1108, and that he did not have the means of extorting Maceira because Maldonado-Nieves was the one who possessed the damaging chat messages, App.1134. Although the defense argued that the threat to release chat messages was not wrongful in the narrow sense that the chats were "based in fact" and "legitimate," App.1134, it was not disputed that Diaz-Colon and Maldonado-Nieves lacked a rightful claim to the property being extorted.

Second, the evidence was overwhelming that Diaz-Colon knew that neither he nor Maldonado-Nieves had a legitimate claim to this property. At Il Postino, Diaz-Colon acknowledged that Maldonado-Nieves's threat to release messages absent the $300,000 payment was extortionate. Suppl-App.60, 96; App.409-11, 462-63. Diaz-Colon's other conduct evidenced his knowledge that he had no claim of right to the money and government contracts he was demanding, including his use of secret Telegram messages to communicate with Maceira, his use of a lowered voice at Il Postino when discussing his extortionist

demands, and his later deletion of his Telegram chat with Maceira while being interviewed by the FBI. *See* pp. 31-32, *supra*. Under *Neder*, any error was harmless.

Finally, the jury's guilty verdict on Count One confirms that omission of a wrongfulness instruction on Count Two did not affect the verdict. The jury found that Diaz-Colon attempted to obtain property through the "wrongful use of actual or threatened fear," knowing that he "was not legally entitled to the property." App.1015. It would have made the same finding as to Count Two if instructed on wrongfulness. *See United States v. Villalobos*, 748 F.3d 953, 957-58 (9th Cir. 2014) (citing finding underlying the jury's guilty verdict on another count as evidence that instructional error on Hobbs Act count was harmless); *United States v. House*, 684 F.3d 1173, 1205-06 (11th Cir. 2012) (similar in non-Hobbs Act case).

5.      The district court correctly rejected Diaz-Colon's request for an instruction to disregard certain language in the indictment.

Diaz-Colon challenges (Br. 127-30) the district court's denial of his request to instruct the jury to disregard, for purposes of Counts Two and Three, the following sub-heading that immediately preceded paragraph 12 in Count One of the indictment: "DIAZ COLON attempts to extort additional money from [Maceira] to prevent the release of additional Telegram messages." App.46. Counts Two and Three incorporated by references the allegations in paragraphs

1 through 18 but did not charge attempt crimes. App.49-50. Diaz-Colon contends that Counts Two and Three incorporated the sub-heading and thereby injected an incorrect attempt element into those counts.[11] This argument is meritless.

In rejecting his instruction request, the district court referenced its denial of the same duplicity challenge that Diaz-Colon raised when moving to dismiss the indictment. App.1036. The court summarily rejected that challenge, finding that Counts Two and Three "do not charge [Diaz-Colon] with attempt to violate 18 U.S.C. § 875(d) or § 1519." S-Suppl-App.388. That determination was correct. Counts Two and Three do not charge an attempt theory of liability. And Count One's reference in a sub-heading to Diaz-Colon's "attempt[]" to extort additional money from Maceira, App.46, did not convert Counts Two and Three into attempt crimes. Only "[t]he allegations contained in paragraphs 1 through 18" of the indictment were "realleged and incorporated [ ] by reference" into Counts Two and Three, not the language of sub-headings organizing those paragraphs. App.49-50.

Even if the sub-heading in question was incorporated into Counts Two and Three, Diaz-Colon's requested "curative" instruction was not warranted. The sub-heading contained only a factual allegation, not language charging

_____

[11] The jury had a copy of the indictment during deliberations. App.1011.

attempt as a legal offense. In any event, the district court instructed the jury on the elements of completed crimes under § 875(d) and § 1519; the court's instructions did not permit the jury to find Diaz-Colon guilty of either offense under an attempt theory. App.1016-19. The jury is presumed to have followed those instructions. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987). It was not necessary to instruct the jury to disregard the sub-heading in Count One for purposes of Counts Two and Three. *See United States v. McBride*, 962 F.3d 25, 33 (1st Cir. 2020) (rejecting claim that jury instructions constructively amended the indictment because jury charge must be evaluated as a whole and jurors are presumed to follow their instructions).

The exclusion of an attempt theory in the jury instructions on Counts Two and Three also rendered any error in denying Diaz-Colon's requested instruction harmless. *See United States v. Karani*, 984 F.3d 163, 180-81 & n.31 (1st Cir. 2021); *see also United States v. Ponzo*, 853 F.3d 558, 584 (1st Cir. 2017) (correct jury instructions precluded finding that erroneous caption in verdict form affected the defendant's substantial rights).

## CONCLUSION

For the foregoing reasons, the judgment of conviction should be affirmed.

Respectfully submitted,

W. STEPHEN MULDROW
 United States Attorney

MYRIAM Y. FERNANDEZ-GONZALEZ
 Assistant U.S. Attorney
 District of Puerto Rico

NICOLE M. ARGENTIERI
 Principal Deputy Assistant Attorney
 General

LISA H. MILLER
 Deputy Assistant Attorney General

MICHAEL N. LANG
 Trial Attorney
 Public Integrity Section

/s/ John-Alex Romano

JOHN-ALEX ROMANO, Attorney
 U.S. Department of Justice
 Criminal Division, Appellate Section
 950 Pennsylvania Avenue, NW
 Washington, DC 20530
 Tel. 202-353-0249
 John-Alex.Romano@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 in Calisto MT 14-point font in text and footnotes.

2.     The brief contains 24,937 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  On May 16, 2024, the Court granted the government's motion for permission to file an answering brief of up to 25,000 words.

**Dated:  May 20, 2024**

/s/John-Alex Romano

JOHN-ALEX ROMANO, Attorney
 Appellate Section, Criminal Division
 U.S. Department of Justice
 950 Pennsylvania Avenue, NW
 Washington, DC 20530
 Tel. 202-353-0249
 John-Alex.Romano@usdoj.gov

## CERTIFICATE OF SERVICE

Undersigned counsel of record certifies that all participants in this case are registered users of the Court's electronic case filing system and that the foregoing Brief for the United States was this day delivered by electronic case filing to the Clerk of the Court and to counsel for defendant-appellant Diaz-Colon.

**DATED:** **MAY 20, 2024**

/s/ John-Alex Romano

JOHN-ALEX ROMANO, Attorney
Appellate Section, Criminal Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel. 202-353-0249
John-Alex.Romano@usdoj.gov